ROBIN SKLAR *vs*. BETH ISRAEL DEACONESS MEDICAL CENTER
(and a companion case[1]).

No. 01-P-467.

Middlesex. March 18, 2003. - October 10, 2003.

Present: DOERFER, McHUGH, & MILLS, JJ.

*Unlawful Interference. Malice. Malicious Prosecution. Libel and Slander. Employment,* Personnel manual, Termination. *Contract,* Interference with contractual relations, Employment, Performance and breach.

In a civil action brought against a hospital employer and an occupational therapist supervisor by an employee whose termination stemmed from a patient's complaint regarding the quality of care she received, as well as a peer audit of the plaintiff's treatment records in response to that patient's disputing of bills for services the plaintiff rendered, a Superior Court judge properly dismissed the plaintiff's claim against her supervisor for intentional interference with advantageous relations, where the record did not support the inferences necessary to create a genuine issue of material fact on the issue of malice [554-556]; likewise, the plaintiff's claim against her supervisor for malicious prosecution based on the supervisor's filing of a complaint against the plaintiff with the professional licensing authorities [556-558], and for defamation arising out of the same circumstances, warranted dismissal, where nothing in the record produced a genuine issue of material fact as to whether the supervisor knew or believed that the audit provided no reasonable basis for thinking it was possible that the plaintiff had violated ethical standards [558].

In a breach of contract action brought by a hospital employee who was terminated from her position as an occupational therapist, a Superior Court judge properly concluded that the hospital's employee handbook and appeals policy did not constitute a contract, where the appeals process did not change the at-will status of the plaintiff's employment; moreover, the plaintiff fully availed herself of her rights under the process to voice her grievances and obtain an official judgment on the appropriate resolution of those grievances. [558-561]

CIVIL ACTIONS commenced in the Superior Court Department on April 26, 1996, and September 18, 1997.

---

[1]Robin Sklar *vs*. Cynthia Zadia. Upon motion of the parties, the cases were consolidated in the trial court for purposes of hearing and trial. The plaintiff's appeals from the judgments have been consolidated in the Appeals Court.

The cases were consolidated and heard by *John C. Cratsley,* J., on motions for summary judgment, and entry of separate and final judgments was ordered by *Judith Fabricant,* J.

*Richard J. White* for the plaintiff.

*Kay H. Hodge* for the defendants.

McHugh, J. This is an appeal from judgments in favor of the defendant Cynthia Zadai dismissing claims for defamation, intentional interference with an advantageous relationship, and malicious prosecution, and in favor of the defendant Beth Israel Deaconess Medical Center (Beth Israel) in an action for breach of contract. As this appeal stems from the defendants' motions for summary judgment, we "summarize the evidence most favorable to the plaintiff and resolve in [her] favor all reasonable inferences that could be drawn from that evidence." *Gram* v. *Liberty Mut. Ins. Co.,* 384 Mass. 659, 660 (1981) (citations omitted). We will affirm the judgments only if the plaintiff has "no reasonable expectation of proving an essential element" of her claim. *McNamee* v. *Jenkins,* 52 Mass. App. Ct. 503, 505 (2001).

For many years, Beth Israel employed Robin Sklar, the plaintiff, as an occupational therapist. In 1990, she resigned her position as chief of the occupational therapy department in favor of a position as a part-time senior occupational therapist.

Several years after the plaintiff made that choice, a patient complained to her that a bill the patient had received overstated the amount of time the plaintiff had spent treating her. In response to this complaint, the plaintiff asked her department's billing manager what she should do. The billing manager told her to forward the complaint to him. The plaintiff then sent him an e-mail requesting that the bill be adjusted in a manner reflecting a reduced amount of time spent with the patient on seven occasions. When no adjustment had been made by the next billing cycle, the plaintiff suggested that the patient contact Anjana Patel, the acting chief of occupational therapy, to determine the status of the matter.

Patel met with the patient on November 11, 1994, and her notes indicate that, in addition to complaining about the amount of her bill, the patient also complained about the quality of the

treatment the plaintiff provided.[2] Patel notified her supervisor, Cynthia Zadai, who was also the plaintiff's supervisor. Zadai asked the plaintiff what she knew about the complaint, but did not directly question her about her treatment decisions or methods. On November 18, 1994, Zadai called the patient. The patient told her of her billing issue but also included complaints about the quality of treatment she had received from the plaintiff.[3]

Under Beth Israel policy, the patient's complaint triggered a peer audit of the plaintiff's treatment records to assess her professional practices. The audit, consisting of four separate components, was conducted by five Beth Israel employees. Zadai alone was responsible for one component and participated with two other employees in a second. The audit concluded that the plaintiff's performance was inconsistent with professional expectations of a senior occupational therapist.[4]

[2] The plaintiff maintains that Patel never subscribed under oath to the content of the notes. The record reflects, however, that Zadai used those notes as a basis for beginning the inquiry that preceded the plaintiff's dismissal. The issue, therefore, is whether Zadai reasonably used those notes as a basis for beginning an inquiry. The plaintiff offers nothing to rebut the appropriateness of her doing so.

[3] The plaintiff claims that Zadai fabricated the contents of her conversation with the patient and that the patient in fact denied "making any complaint" about her. As a basis for her assertion on that score, however, the plaintiff relies on what circumstantially appear to be unsworn, unauthenticated, working notes of an investigator for the Board of the Allied Health Professions, the licensing agency for physical and occupational therapists that reflected what the patient told him. Even in the absence of a motion to strike, a judge is perfectly free to exercise his discretion in favor of ignoring that kind of totem-pole hearsay. See *Madsen* v. *Erwin*, 395 Mass. 715, 721 (1985). See also note 8, *infra*. Moreover, to the extent that the notes say that the patient denied making "any" complaint, they contradict the plaintiff's own deposition testimony.

[4] The plaintiff maintains that the audit was improperly carried out, relied on inaccurate and incomplete records, and that Zadai was incompetent to perform the tasks she undertook in connection with the audit. The plaintiff offers no evidence to support those contentions. More important, in relation to the claims she has asserted against Zadai, the plaintiff offers nothing to suggest that Zadai knew or believed either that she, herself, was incompetent, or that the peer review process was somehow defective. The plaintiff does agree that her documentation in the patient's medical record was incomplete. She also agrees that she was alerted to similar deficiencies in other records when she received her 1992 performance review.

Following the audit and the plaintiff's statement to Zadai that, inter alia, she could change the complaining patient's medical chart so that it matched any reduced billing the hospital ultimately made,[5] Zadai terminated the plaintiff from employment and provided her with a letter detailing why. The termination date was January 5, 1995.

The plaintiff elected to appeal her dismissal through the process described in a Beth Israel employee handbook, rather than accept Zadai's offer of a voluntary resignation. The appeals process consisted of a five-step review of the discharge decision involving three reviews by higher level managers ending with a hospital vice-president, then by a committee of employees, and lastly, the hospital president. At each step, the decision was upheld. The committee of employees that unanimously voted to uphold the dismissal was comprised of two members chosen by the plaintiff, two members chosen by the president of the hospital, and a fifth member chosen by the plaintiff from a predetermined panel of employees. A human resources division representative served as a neutral chairperson. The president's decision is embodied in a letter to the plaintiff dated March 30, 1995.

On July 1, 1995, Zadai filed with the Board of Allied Health Professions (board) a complaint alleging violations by the plaintiff of professional standards. Zadai also notified the American Occupational Therapy Association ("AOTA") of the results of the Beth Israel internal review of the plaintiff's performance. The board later notified Zadai that it had closed the case for lack of evidence and cautioned her against filing frivolous complaints.

On April 26, 1996, the plaintiff filed suit in Superior Court, alleging that Zadai had intentionally interfered with her advanta-

---

[5]The termination letter Zadai gave to the plaintiff, in addition to reciting the audit results and other details surrounding the sequelae to the patient's complaint, stated that, when Zadai asked the plaintiff why it would be appropriate to reduce the patient's bill in such a way that it no longer matched the plaintiff's medical chart, the plaintiff responded by saying that she "should have changed the chart to match the bill." Given the multitude of reasons why it is essential for health care providers to maintain accurate medical records, see, e.g., G. L. c. 111, § 70; G. L. c. 112, § 12CC, it is noteworthy that the plaintiff does not contest the accuracy of that component of Zadai's letter.

geous relationship with Beth Israel, causing her to be terminated from employment and that Zadai had defamed and maliciously prosecuted her when Zadia wrote the dismissal letter and filed complaints with the board and the AOTA. The plaintiff also brought suit against Beth Israel for nonpayment of wages and breach of an implied contract based on its employee handbook and its appeals policy. On November 2, 2000, a judge of the Superior Court granted the defendants' motions for summary judgment on all claims save the one for nonpayment of wages. Separate and final judgments entered for the defendants pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), and the plaintiff appealed. We affirm.

Dealing first with the plaintiff's claim of interference with an advantageous relationship, success requires proof that "(1) she had an advantageous employment relationship with her employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions." *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 781 (2001). Where the defendant is a supervisor who, in the context of his or her employment, is privileged to interfere with the employee's advantageous relationship, the plaintiff must show, for the purposes of the third element, that the improper motive or means rose to the level of "actual malice" and was the "controlling factor" in the defendant's interference. *Ibid.*[6] "Actual malice," in turn, is determined by the defendant's state of mind — namely, whether the defendant had a " 'spiteful, malignant purpose, unrelated to the legitimate corporate interest' of the employer," *id.* at 782, quoting from *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993), or put differently, was personally hostile or harbored ill will toward the plaintiff. *Id.* at 783. See, e.g., *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. 686, 690

---

[6]In *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 814-816 (1990), the Supreme Judicial Court abandoned any requirement that the defendant act "with malice" in a claim for intentional interference and held that the lawfulness of the conduct would be measured by whether it was "improper" in motive or means. As is evident in our discussion, *infra*, an exception is made when the complaint names an individual official of the plaintiff's employer. See *Weber* v. *Community Teamwork, Inc.*, 434 Mass. at 781.

(1996) (sufficient evidence of malice where supervisor, "prompted by his resentment," screamed at and insulted employee daily); *Clement* v. *Rev-Lyn Contr. Co.*, 40 Mass. App. Ct. 322, 325 (1996) (slandering in the presence of others without basis and threats of physical violence sufficient to demonstrate actual malice). Of course, evidence of a spiteful purpose or hostility may not always be direct and, therefore, "[m]alice may be shown by the proof of facts from which a reasonable inference of malice may be drawn." *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. at 664. Proof by inference, however, will not succeed if the plaintiff can show nothing more than an adverse impact or a "laundry list" of facts which may or may not indicate the defendant acted out of actual malice. *Alba* v. *Sampson*, 44 Mass. App. Ct. 311, 315 (1998). *Shea* v. *Emmanuel College*, 425 Mass. 761, 763-764 (1997) (no reasonable inference where there is evidence of "trouble on the job" and plaintiff's inferences amount to speculation).[7] To succeed then, the plaintiff should be prepared to demonstrate a link between the defendant's conduct and evidence of a spiteful purpose or personal hostility. See, e.g., *McNamee* v. *Jenkins*, 52 Mass. App. Ct. at 509 (evidence that defendant had cause to resent plaintiff and had complained to superiors he was "picked on" supports inference of malice).

The essence of the plaintiff's argument is that her advocacy for a family-friendly workplace angered Zadai and generated her ill will towards the plaintiff. That ill will, in turn, motivated Zadai to fabricate the patient's quality of care complaint and to conduct an inadequate investigation to justify dismissing the plaintiff. Working backwards, as she must, the plaintiff contends that because she can prove facts which support the inference that Zadai fabricated the complaint and intentionally conducted an inadequate investigation, it is reasonable to infer that, given the plaintiff's advocacy for working parents, Zadai did so

---

[7]Although the plaintiff here had received a nomination for an employee award at Beth Israel and positive performance reviews, there had been "trouble on the job." In November of 1994, Zadai and the plaintiff had a meeting in which Zadai strongly criticized eight aspects of the plaintiff's job performance and stated that she would be terminated unless she prepared a plan of corrective action within two weeks. The plaintiff responded with a letter stating that all of the criticisms were false and baseless. The denouement of that exchange does not appear in the record.

because she was personally hostile toward the plaintiff or had a spiteful, malignant purpose. The record supports none of the inferences the plaintiff proffers.

First, there simply is no admissible evidence in the record that Zadai fabricated the patient complaint. As noted, the patient's alleged denial to the licensing investigator that she made a complaint is totem-pole hearsay. See note 3, *supra.*[8] Second, although Zadai could have taken additional steps in her investigation, it is also true that any investigation could have been better. Moreover, even a negligent, sloppy, or callous investigation does not produce an inference of spite or personal hostility. See *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. at 665 (negligent or "sloppy and unfair business practices" insufficient to establish malice). *Weber* v. *Community Teamwork, Inc.*, 434 at 783 (callous or abrupt dismissal followed by ill treatment, and arbitrary basis for hiring replacement, insufficient to show malice). Most important, though, is the absence of any evidence that Zadai knew of the plaintiff's advocacy or, even if she did, resented it. Nor is there any evidence that Zadai behaved differently toward the plaintiff compared with other part-time employees because she was a parent, or that Zadai was hostile to all working parents. Cf. *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129-130 (1997). Finally, there is no evidence that Zadai humiliated or screamed at the plaintiff, or otherwise behaved in a manner that fell outside the scope of her supervisory duties. In sum, the record does not support inferences necessary to create a genuine issue of material fact on the issue of malice.[9]

The plaintiff's second claim is for malicious prosecution aris-

---

[8]The plaintiff's reliance on the "official record" exception to the hearsay rule is misplaced. That exception does not apply to "second level hearsay," such as the patient's statement to the board's investigator. See *Kelly* v. *O'Neil,* 1 Mass. App. Ct. 313, 318-319 (1973); *Building Inspector of Chatham* v. *Kendrick,* 17 Mass. App. Ct. 928, 929-930 (1983). Nor is the business record exception available, because the patient was under no business obligation to report anything to the investigator. See *Wingate* v. *Emery Air Freight Corp.,* 385 Mass. 402, 406 (1982).

[9]Even establishing the requisite malice on Zadai's part would not end the difficulties with the plaintiff's interference claim because, given the several layers of review in which the dismissal was upheld, it is hard to see any causal connection between Zadai's alleged malice and the final discharge

ing out of the complaint Zadai filed with the licensing authorities. To succeed, the plaintiff must establish that a legal proceeding was (1) brought by the defendant, (2) commenced maliciously, (3) without probable cause, and (4) terminated in the plaintiff's favor. *Hubbard* v. *Beatty & Hyde, Inc.*, 343 Mass. 258, 261 (1961). *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593 (1982). *Carroll* v. *Gillespie*, 14 Mass. App. Ct. 12, 19 (1982).

Assuming that a claim for malicious prosecution can arise out of a report to an administrative agency, see Restatement (Second) of Torts § 680 (1977), and assuming that such a claim can arise out of a report that leaves the question whether to proceed to the recipient's discretion, see *Ziemba* v. *Fo'cs'le, Inc.*, 19 Mass. App. Ct. 484, 485-486, 488 (1985) (where defendant gives information to third party who in turn exercises discretion, defendant did not initiate the proceedings); Dobbs, Torts § 436 (2000), the plaintiff's claim fails because she has failed to raise a genuine issue of material fact on the question of malice.

To raise a genuine issue of material fact on the question of malice, the plaintiff must come forward with some evidence that would permit a fact finder to conclude that Zadai (1) knew there was no probable cause, and (2) acted with an improper motive, *Beecy* v. *Pucciarelli*, 387 Mass. at 593-594; *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 100-101 (1987), i.e., acted "primarily for a purpose other than that of properly adjudicating" the claim. *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 273 (1991). See Restatement (Second) of Torts § 674. More specifically, the plaintiff must show that Zadai was "attempting to achieve an unlawful end or a lawful end through unlawful means," or intended to harass, vex, or annoy her. *Beecy* v. *Pucciarelli*, *supra* at 594 n.9. Wanton or negligent behavior is insufficient without some evidence of an ulterior purpose. See *id.* at 594; *O'Connell* v. *Bank of Boston*, 37 Mass. App. Ct. 416, 420 (1994).

For the reasons listed earlier, the record does not give rise to

decision. See *McNamee* v. *Jenkins*, 52 Mass. App. Ct. at 508 (element of claim is that the "loss of the advantage" resulted from defendant's conduct). See also *Walker* v. *Cronin*, 107 Mass. 555, 564 (1871); *Adcom Products, Inc.* v. *Konica Bus. Machs. USA, Inc.*, 41 Mass. App. Ct. 101, 106 (1996).

a genuine issue of material fact on the question of malice. Moreover, Zadai's letter essentially contained the report of the audit. Nothing in the record produces a genuine issue of material fact on whether Zadai knew or believed that the audit was "so flawed or superficial that it provided no reasonable basis" for thinking it was possible the plaintiff violated ethical standards. *O'Connell* v. *Bank of Boston, supra.* See Dobbs, Torts § 436, at 1220.

The third claim against Zadai, this one for defamation, fails for essentially the same reason. This claim arises out of the same circumstances that produced the claim for malicious prosecution, i.e., Zadai's transmission of the audit report to the licensing authorities. But, in this Commonwealth, a publisher is conditionally privileged to publish defamatory material if he or she is a supervisor, executive, or a corporate officer and the information "is reasonably related to the employer's legitimate business interest," *Foley* v. *Polaroid Corp.*, 400 Mass. at 95, or if the publisher and the recipient share a common interest "and the communication is of a kind reasonably calculated to protect or further it." *Sheehan* v. *Tobin*, 326 Mass. 185, 190-191 (1950), quoting from Prosser, Torts, at 837-838. *Bratt* v. *International Bus. Machs. Corp.*, 392 Mass. 508, 513 n.8 (1984). The conditional privilege is lost if the defendant (1) knew the information was false, (2) had no reason to believe it to be true, or (3) recklessly published the information unnecessarily, unreasonably, or excessively. See *Retailers Commercial Agency, Inc., petitioner*, 342 Mass. 515, 522 (1961); *Bratt* v. *International Bus. Machs. Corp., supra* at 514-515 & n.11; *Foley* v. *Polaroid Corp., supra* at 95; *Mulgrew* v. *Taunton*, 410 Mass. 631, 636 (1991). The undisputed facts show that Zadai's publication is covered by the conditional privilege and the record simply does not produce a genuine issue of material fact on the issue of recklessness.[10]

The plaintiff's final claim asserts that Beth Israel's employee handbook and appeals policy created an employment contract, the terms of which were breached when Beth Israel failed to

---

[10]Given the result we reach, we have no occasion to consider Zadai's assertion that the plaintiff's claims of defamation and malicious prosecution are barred by the anti-SLAPP statute, G. L. c. 231, § 59H.

follow various procedures the appeals policy contained, chiefly those providing that she could call and interrogate witnesses. The motion judge concluded that the handbook did not constitute a contract and entered summary judgment for Beth Israel on that ground.

Even if the handbook were a contract, see *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. at 692, the provisions dealing with appeals essentially set up a mechanism for addressing managerial decisions that an employee "feels [are] personally unfair or unjust." The first three levels of review are designed to achieve, if possible, a consensual resolution to whatever problem the employee is addressing. The fourth level of review involves the appeals hearing committee and has greater structure than the first three levels. The appeals hearing committee's function, however, remains highly discretionary. The procedures state the following:

> "The Appeals Hearing Committee does not set Hospital policy. Its responsibility is to decide whether the decision about which the employee is appealing was within Hospital policy, whether the immediate manager's use of judgment in interpreting Hospital policy was satisfactory, whether it was based on sufficient information at the time it was arrived at, and whether it appears that the manager gave the information adequate attention at the time. The Committee is also to take into consideration what the employee is appealing for and whether that is reasonable, in the light of their decision about the problem appealed. As full an explanation as practical of the reasoning and judgment behind the decision is to be conveyed as well.
>
> . . .
>
> "The decision of the Appeals Hearing Committee is not binding. Rather, [the committee] serves in an advisory capacity, to the appealing employee and involved managers and, in addition, to the President."

If the employee is not satisfied with the appeals hearing committee's response to the problem, the employee may appeal to the president of the hospital, whose decision alone is "final and

binding." The dissatisfied employee has the right to appeal anything to the president including claims of procedural irregularity in the appeals process itself. Indeed, a substantial component of the plaintiff's appeal to the president in this case dealt with the procedural claims she presses here. Although the policy states that the president will place great weight on the decision of the appeals hearing committee, it does not bind him to follow that decision and specifically states that he will not do so if the decision is "unsupported by the facts as made known to" him. Finally, use of the appeals machinery is an option, not a requirement, for employees, who remain free to commence legal proceedings any time they choose to do so but with the consequence that the appeals proceedings terminate when litigation begins.[11]

From that outline, it is evident that the appeals process does not change the at-will status of employees such as the plaintiff, and the plaintiff makes no claim to the contrary.[12] Instead, the process functions as a workplace mediation mechanism designed to remove, if possible, feelings of workplace injustice, whether or not those feelings arise out of proven violations of hospital rules or policies. Ultimately, the process is designed to allow every employee, if necessary, to voice his or her grievances, of whatever kind and character, to the top operating official at the hospital and obtain his judgment on the appropriate resolution of those grievances. The plaintiff had that opportunity, presented the president with her claims of unfairness, substantive and procedural, and received his decision. "A court is hardly in a position to treat the right to be heard, the right to tell one's side of the story, as valueless," *Ferguson* v. *Host Intl., Inc.*, 53 Mass. App. Ct. 96, 105 (2001), and we surely do not do so here, although we note that much of the right's value depends

---

[11]The appeals policy states that employees can terminate the process at any time, and the plaintiff asserts that she was not given the option to do so. But the plaintiff never sought termination of the process, pure and simple. Instead, she sought to terminate the process and substitute a resignation for her involuntary dismissal. The appeals policy did not provide her with that right of substitution and neither did the president.

[12]Accordingly, the plaintiff remained subject to dismissal for good reason, bad reason, or no reason at all. See *Upton* v. *JWP Businessland*, 425 Mass. 756, 757 (1997).

on how seriously the right is treated at each level of review, including the presidential. But the plaintiff exercised that right all the way to the very top of the corporate pyramid and, at least absent bad faith or other misdeeds at that level, the contract entitled her to no more. Thus, there was no breach of contract.

*Judgments affirmed.*