**RIVERDALE MILLS CORPORATION and James M. Knott, Sr.,**
Plaintiffs,

v.

**UNITED STATES of America, Stephen Creavin, Justin Pimpare, Daniel Granz, and Three Unknown Agents of the United States Environmental Protection Agency Defendants.**

No. CIV.A. 00–40137–NMG.

United States District Court,
D. Massachusetts.

Nov. 1, 2004.

Dennis C. Barghaan, U.S. Department of Justice, Torts Branch Civil Division, Washington, DC, for Three Unknown Agents of the Federal Bureau of Investigation, USA, Daniel Granz, Justin Pimpare, Stephen Creavin, Defendants.

Henry T. Dunker, Weymouth, MA, for Riverdale Mills Corp, James M. Knott, Sr., Plaintiffs.

Carl N. Edwards, Dover, MA, for Riverdale Mills Corp, James M. Knott, Sr., Plaintiffs.

Marie Louise Hagen, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for James M. Knott, Sr., Plaintiff.

Paul D. Kamenar, Washington Legal Foundation, Washington, DC, for Riverdale Mills Corp, James M. Knott, Sr., Plaintiffs.

Jamy B. Madeja Buchanan & Associates, Boston, MA, for Riverdale Mills Corp, James M. Knott, Sr., Plaintiffs.

Warren G. Miller, Miller & Miller, Boston, MA, for Riverdale Mills Corp, James M. Knott, Sr., Plaintiffs.

Kristy L. Parker, U.S. Dept. of Justice, Washington, DC, for Three Unknown Agents of the Federal Bureau of Investigation, USA, Daniel Granz, Justin Pimpare, Stephen Creavin, Defendants.

R. Joseph Sher, U.S. Department of Justice, Washington, DC, for Three Unknown Agents of the Federal Bureau of Investigation, USA, Justin Pimpare, Stephen Creavin, Daniel Granz, Defendants.

Barbara Healy Smith, United States Attorney's Office, Boston, MA, for U.S., Daniel Granz, Justin Pimpare, Stephen Creavin, Defendants.

## MEMORANDUM OF DECISION

GORTON, District Judge.

On August 8, 2000 Plaintiffs filed the instant action under the Federal Tort

Claims Act, 28 U.S.C. § 2671 et seq. ("the FTCA"), alleging that the United States of America, through its agents, maliciously prosecuted them by bringing criminal charges against Plaintiffs for alleged violations of the Clean Water Act, 33 U.S.C. § 1251 et seq. The parties appeared for trial before this Court, sitting without a jury, on July 22, 2004, and three subsequent trial days. The Court now announces its findings of fact and conclusions of law.

## I. *Findings of Fact*

1) Riverdale Mills Corporation ("RMC" or "Riverdale Mills") and its principal owner, James M. Knott, Sr. ("Knott") operate a plant in Northbridge, Massachusetts which manufactures zinc galvanized, plastic-coated, welded steel wire mesh. The production involves two processes, one that produces acidic wastewater ("the galvanizing line") and the other that produces caustic, or alkaline, wastewater ("the coating line"). RMC ultimately discharges that industrial wastewater into the public sewer owned by the Town of Northbridge.

2) Knott owns the land and building where the facility is located, including the private roadway between the building and the millpond across the roadway, and RMC leases the building from Knott.

3) In 1997, Riverdale Mills constructed a system to insure that the wastewater from its operations was treated before being discharged from the building. The system was designed to combine the two streams of wastewater inside the plant and add a caustic soda to them so that metals would be precipitated out of the wastewater and so that when the acidic water was released it would be within the pH limits set by law and by RMC's permit. That process is known as "pretreatment".

4) Following pretreatment, described above, according to the design of the pre-treatment system, the now-combined wastewaters would flow intermittently through a pipe to a manhole just outside the building on Riverdale Street ("Manhole # 1"), where it joins a sewer pipe. The discharge would then flow through that pipe for approximately 300 feet to a second manhole ("Manhole # 2") where the pipe joins a public trunk sewer line which ultimately discharges at the Town of Northbridge's treatment plant.

5) In late summer of 1997, the Environmental Protection Agency ("EPA"), Region 1 received an anonymous letter purporting to be from an RMC employee, "WWT operator/1st shift". The letter asserted that the company had allowed its treatment facility to fall into disrepair and reported that the plant's wastewater pretreatment system was not functioning, that no one at the plant was assigned to operate or maintain the system and that the writer was concerned that the company was violating wastewater pretreatment standards for zinc, iron and pH because it was discharging wastewater without pretreatment. The letter was routed inside the EPA to both the Criminal Investigation Division ("CID") and, through the Office of Environmental Stewardship, to the Office of Environmental Measurement and Engineering ("OEME") in Lexington, Massachusetts.

6) OEME is composed of environmental engineers who conduct inspections of, among others, industrial users identified by the Office of Environmental Stewardship and also provide technical assistance to the Agents of the CID. Lacking powers of arrest and search, OEME employees are not law enforcement officers as that term is defined in the FTCA. CID is staffed by Special Agents who are such law enforcement officers, i.e. they are authorized by law to conduct searches and to make arrests in the course of investiga-

tions of violations of federal environmental statutes which Congress has determined should carry criminal as well as civil sanctions.

7) When OEME received its copy of the anonymous letter with the request that it conduct a compliance inspection of RMC, Team Leader Elizabeth Deabay ("Deabay") assigned Inspectors Karen Baker ("Baker") and Justin Pimpare ("Pimpare") to conduct an inspection. The inspection was scheduled for October 21, 1997. At CID, Special Agent Stephen Creavin ("SA Creavin") was given a copy of the anonymous letter by his supervisor and was assigned to look into the matter. SA Creavin recorded the letter as a "lead", the term used inside CID to refer to information which warranted further inquiry in order to determine whether an investigation should be undertaken.

8) On October 21, 1997, Inspectors Baker and Pimpare traveled from the Lexington lab to Riverdale Mills in Northbridge, Massachusetts. At some time that morning, prior to the beginning of the inspection, Deabay received word of a medical emergency in Baker's family and, as a result, she assigned Inspector Daniel Granz ("Granz") to go to Riverdale Mills instead of Baker.

9) Granz had not heard of Riverdale Mills or Knott prior to being assigned replace Baker on the inspection. He did not talk to SA Creavin before he went to Riverdale Mills on October 21, 1997 nor did he see the anonymous letter before 12:00, Noon of that day. When Granz arrived at Riverdale Mills, an "initial conference" involving Inspector Pimpare, Knott and two Riverdale Mills employees, Brian Benoit ("Benoit") and Dennis Veader ("Veader"), was in progress and was nearing conclusion.

10) On October 21, 1997, Knott consented to an inspection of the RMC plant on the express condition that the inspectors be accompanied at all times by designated representatives of RMC so that they could personally witness whatever the EPA agents observed or sampled.

11) Prior to Granz's arrival, Knott explained to Pimpare that the Riverdale Mills wastewater treatment system included mixing two separate streams of process wastewater in a tank so that the pH would be raised, the metals would drop out and the precipitated metals would be put through a filter press and taken to a landfill.

12) The inspection that day confirmed, however, that, as alleged in the anonymous letter, the wastewater pretreatment system was not operational and apparently had not been so for some time. There were no operating manuals, monitoring or maintenance records or logs of any kind available in the area. Many parts were either disconnected or in disrepair. Riverdale Mills Executive Vice President Paul McGuann ("McGuann") was present with the inspectors when they looked at the wastewater pretreatment systems and he later compiled a list of several repairs and replacement parts that were needed to bring the system into compliance and proposed a schedule for completion of the project by mid-December 1997. The scheduled tasks included plans to "connect coating line to mix tank # 1" and to "determine current piping scheme to get coating to mix tank # 1". Another task was to "create a documented WWT piping schematic for the current input sources".

13) During the morning of October 21, 1997, the Inspectors informed Knott that, as part of the inspection, they wanted to take samples of RMC's wastewater discharge. After their initial morning conference, Knott led them to Manhole # 1 and

told them it was the best place to sample the discharges.

14) When the five individuals arrived at Manhole # 1 that morning, there was initially no flow. Wastewater did, however, eventually flow into Manhole # 1. In the presence of Knott, Benoit and Veader, the Inspectors took several grab samples of wastewater at Manhole # 1 over an 18–minute period. Granz took those samples by lying on his stomach in the street and reaching into Manhole # 1 to fill containers with wastewater. While he did so, Pimpare labeled the containers, added preservative where required by EPA regulations and put them on ice for later transport to the laboratory. Several samples were taken for "volatile organic analysis" and to be tested for pH, metals and suspended solids. Those samples were all "split", i.e. taken in duplicate and given to Plaintiffs for later independent testing. On October 24, 1997, RMC delivered the seven containers holding their samples to a contract lab.

15) The Inspectors also performed an on-site test of the pH on the morning of October 21, 1997, and reported the results to the three RMC representatives at Manhole # 1. The Inspectors told the group that the initial reading indicated a pH of 12.36.

16) The Inspectors took additional readings of the pH level of the wastewater later that day with a pH probe and meter outside of the presence of any RMC employees and in contravention of the condition imposed by the Plaintiffs for the inspection. Those readings indicated a low (acidic) pH level of between 2 and 3.

17) The Inspectors may have misunderstood the scope of their permission and there is insufficient evidence to conclude that they proceeded in bad faith. They apparently were not told, before readings were taken, that Riverdale Street, which runs along the front of the RMC plant, was not a public road. It is a paved road that intersects with Route 22 and passes over a bridge that was built by the Town of Northbridge. The road provides access to a residential area on the side of the Blackstone River opposite the mill.

18) A split sample from the mid-day tests was given to Benoit, an RMC employee, later on October 21, 1997, and he signed a chain of custody form when he received the sample, indicating the time at which the sample was taken.

19) Before the Inspectors left RMC on October 21, 1997, they informed Knott that they had observed readings of both high and low pH which indicated to them that the two streams of wastewater were not combining inside the plant.

20) Some of the readings at Manhole # 1 that were recorded on October 21, 1997, at below pH 5 were overwritten and/or corrected, but the alterations were legitimate corrections of earlier entries and not falsifications. Although the technique used for correcting the entries was careless and negligent, there is insufficient evidence to find that they were made in bad faith.

21) At the end of the afternoon tour of the inoperable wastewater pretreatment system, the two Inspectors conducted a closing conference with Knott, McGuann and Benoit. At that conference the Inspectors expressed concern about the high and low pH readings, as well as the inoperable wastewater pretreatment system. Knott declined an invitation of the Inspectors to go to the basement to view the pretreatment system and did not question how they had obtained additional samples at Manhole # 1. Instead, he responded to the information about the low pH readings by indicating that he thought the EPA should not be concerned with what RMC

put into the sewer because he owned the street in front of the plant. Knott further explained, verbally and by drawing a diagram, that there were other manholes in Riverdale Street where the sewer line from Manhole # 1 joined the "city main".

22) When they left the closing conference on October 21, 1997, the Inspectors went to Manhole # 2, which was located by the railroad tracks on Riverdale street and is owned by the Town of Northbridge. In an attempt to verify that the wastewater from Manhole # 1 discharged into Manhole # 2, they took three readings by pH paper. Granz drew a diagram in his field notes of the inside of Manhole # 2 indicating where he believed three separate streams of wastewater were entering it. He conducted a test by pH paper at the three places. The entry for the pH at the outfall pipe that carried wastewater from Riverdale Mills (Manhole # 1) appears in his logbook as a "4" written over another number, probably a 7. The reason for the correction is unclear.

23) Granz was not assigned again to do any technical testing at Riverdale Mills and has not been to the site since the October 21, 1997 inspection. Because he was not the lead inspector, he did not write an inspection report but the data he recorded were included in Pimpare's reports. Granz was not involved in any discussions about whether to initiate or proceed with a criminal investigation against RMC. He did not talk to SA Creavin about the subject or provide his original logbook to anyone connected with the case until months later.

24) On the day after the inspection, Inspector Pimpare verbally reported the results to his supervisor. She advised him to call CID to share the results with them. Pimpare then called SA Creavin and reported that the wastewater pretreatment system was not working and apparently

had not been working for some time and that high and low pH readings were present in the sewer outside Riverdale Mills.

25) SA Creavin consulted with his supervisor, Special Agent in Charge Michael Hubbard ("SAC Hubbard") and with the EPA's Regional Criminal Enforcement Counsel, Peter Kenyon ("RCEC Kenyon"). Shortly thereafter, he spoke to Jonathan Kotlier, Chief of the Economic Crimes Unit of the U.S. Attorneys' Office and then received a call from William Stimpson ("AUSA Stimpson"), an Assistant United States Attorney, who had been assigned to the matter by Kotlier.

26) SA Creavin worked with AUSA Stimpson on the investigation, including the application for a search warrant to search the premises at Riverdale Mills on November 7, 1997. In the execution of that search, a technical team of two Clean Water Act environmental engineers, one environmental engineer from the air emissions testing side and the technical coordinator from the National Enforcement Investigation Center, assisted. They took further wastewater samples, primarily from Manhole # 1. The samples were taken with a pH probe that was set into the wastewater discharge and gave continuous readings. After an initial reading of neutral by pH paper, most of the probe's readings were in the 2's and 3's.

27) Early in the day on November 7, 1997, several readings by pH paper were taken at Manhole # 2 by the air emissions environmental engineer who was assisting the technical team. He recorded in his logbook seven pH readings in the 5's or 6's. Readings by pH paper provide only a rough guide and have a margin of error of a full point or more so the subject readings are not determinative of whether there was a violation.

28) At the time of the November 7, 1997, search, the questions of whether Knott owned Riverdale Street and the 300 feet of sewer line in Riverdale Street between Manhole # 1 and Manhole # 2, were not yet resolved. No one on the technical team who assisted law enforcement officers in executing the search warrant was responsible for resolving those legal questions.

29) Nor was SA Creavin charged with the duty of resolving the legal issue of the ownership of Riverdale Street or of the sewer pipe beneath it. SA Creavin did, however, interview the Town of Northbridge Sewer Superintendent, James Madigan, to determine who constructed the sewer pipe. Creavin learned that the Town had constructed 150 feet of the pipe and that the previous owner of the plant had constructed the remainder of it.

30) Evidence at trial established that the issues of ownership of the street and sewer line were researched by EPA attorneys and that, at least until the indictment in August, 1998, those attorneys believed that Knott did not own the sewer line and/or that the sewer line in Riverdale Street was part of the publicly owned treatment works ("POTW"). In fact, at all times before the dismissal of the criminal case, the EPA attorneys believed a) that discharges to Manhole # 1 could subject RMC to liability under the Clean Water Act because the POTW began at Manhole # 1, but b) proof of ownership of Manhole # 1 would "complicate the case".

31) In the meantime, SA Creavin conducted interviews of current and former RMC employees. Creavin was told that Knott had been aware for months that the wastewater pretreatment system was inoperable but that Knott had never put it on the maintenance "priority list". Information received from RMC employees who were interviewed, including senior engineering personnel, indicated that Knott had been making all the decisions regarding operations and maintenance at the plant for at least the past nine months, that he focused on production issues and on reducing costs and that he insisted that projects directed toward reducing the cost of production be given priority over maintenance issues.

32) During the November 7, 1997 search, EPA personnel also observed that the required pretreatment system at the RMC plant remained partially inoperative. On that day the two wastewater streams were mixing in the plant but the process of adding caustic soda was still being bypassed.

33) At that November, 1997, inspection, Knott asserted that on October 21, 1997, there was an "accidental discharge" at too low and too high a pH due to deficiencies in the wastewater treatment system at the plant. Contemporaneously, he told RMC employees in a written memorandum that mixing equipment in the basement was not working properly on October 21, 1997 and thus soap and acid process wastewater were being "discharg[ed] to the Riverdale sewer" separately, when they "should be mixed in the cellar before entering Riverdale Street".

34) Although Plaintiffs claimed that the only thing wrong with the wastewater pretreatment system was that a valve located in the ceiling of the basement was set incorrectly, there was much more wrong with the pretreatment system than a valve setting. During the Fall of 1997 Knott, RMC's Executive Vice President and RMC's maintenance staff agreed that substantial repairs were required over a period of several weeks to get the pretreatment system operating properly and to get the plant's wastewater discharge into compliance.

35) Following the October 21, 1997 inspection, RMC maintenance personnel exchanged a series of e-mails discussing efforts "to get the wastewater treatment area back into compliance". They acknowledged that the agitator in one mix tank needed to be repaired or replaced, a pH control sensor and a caustic feed pump needed to be installed, the pH sensor needed to be hooked up electronically to a mix tank and the agitator and chemical feed pumps needed to be repaired and parts ordered. On November 17, 1997, Executive Vice President McGaunn still referred to the project as "moving forward to getting into compliance in the waste water treatment area".

36) In early November 1997, Plaintiffs did not fully understand the complicated piping system that carried wastewater from the manufacturing areas through to the street. No field notes from the October 21, 1997, inspection indicate that any RMC personnel pointed out to Granz or Pimpare the valves in the ceiling that allegedly can be turned so that coating line process wastewater will bypass the pretreatment system.

37) Notwithstanding Knott's testimony that some of the functions of the wastewater pretreatment system, in particular the settling tank to precipitate metals out of the wastewater and the feature that automatically added caustic soda to lower pH levels beyond that effected by merely combining the two wastewater streams, were no longer necessary due to changes in 1995 in RMC's manufacturing processes, it is clear from actions taken by the company and statements made by Knott and other RMC employees that the Plaintiffs recognized that the system was not superfluous.

38) Although Plaintiffs asserted at trial that it was physically impossible for wastewater with a pH below 5 to leave the building, this was not their position in 1997

nor did the testimony of their experts support their contention.

39) Whether or not there was an economic disadvantage to RMC not to have the coating line process wastewater mix with the water from the galvanizing line to help neutralize it, it is clear that in the Fall of 1997, Knott and RMC allowed the system to fall into serious disrepair.

40) In October, 1997, Knott told EPA inspectors that he did not know where his EPA permit was or what the limits were and it was not until a meeting on November 10, 1997 that he assigned someone to "find the permit and tell us what we can discharge into the town system".

41) In July 1998, the EPA executed a second search warrant to measure the effects of groundwater infiltration between Manhole # 1 and Manhole # 2. That inspection was conducted in response to the Plaintiffs' claim that Knott owned the intervening sewer line and that, by the time the wastewater reached the public sewer, groundwater infiltration inevitably brought it within the legal limit. The Court accepts the conclusion of the EPA's expert that, even making assumptions favorable to Knott, any wastewater with a pH below 3.0 at Manhole # 1 would reach the sewer line at Manhole # 2 with a pH below 5.0.

42) On August 12, 1998, a federal grand jury indicted Knott and RMC on two counts of violating the Clean Water Act by knowingly discharging industrial wastewater with a pH below 5.0 into a POTW on October 21 and November 7, 1997.

43) On October 14, 1998, Knott and RMC moved to suppress evidence from the afternoon sampling on October 21, 1997 as being the result of an unlawful search and also to suppress the sampling obtained at the November 7, 1997 search, as the "forbidden fruit" of the October 21 sampling.

44) On February 16, 1999, this Court suppressed the sampling results from the afternoon of October 21, 1997, finding that the EPA inspectors exceeded the scope of Knott's consent when they sampled the wastewater stream at Manhole # 1 without an RMC representative present. The Court declined, however, to suppress the evidence obtained on November 7, 1997, reasoning that even though the warrant was based, in part, upon the October 21, 1997 afternoon sampling, the agents acted in good faith executing the warrant.

45) The United States sought leave of Court to dismiss the indictment without prejudice on April 23, 1999 after determining that the suppression had substantially weakened its case. Leave of the Court to dismiss the indictment without prejudice was allowed on May 6, 1999.

## II. Conclusions of Law

A. The FTCA provides a limited congressional waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment. 28 U.S.C. § 2671 et seq. Under the statute, the United States may be held civilly liable "in the same manner and to the same extent as a private individual under like circumstances". *Id.* § 2674. Certain kinds of intentional torts are not included in the FTCA's waiver of sovereign immunity, but statute permits claims against the United States for the torts of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" arising out of "acts or omissions of investigative or law enforcement officers of the United States Government". *Id.* § 2680(h); *Santoni v. Potter*, 369 F.3d 594, 602 (1st Cir. 2004). In this case, the Plaintiffs' claim is for malicious prosecution under Massachusetts law.

■ B. Under Massachusetts law, the elements of a claim for malicious prosecution are: 1) the institution of a criminal process against Plaintiff, 2) with malice by the defendant, 3) without probable cause and 4) termination of the proceedings in the plaintiff's favor. *Gutierrez v. Massachusetts Bay Transportation Authority*, 437 Mass. 396, 772 N.E.2d 552, 561 (2002).

■ C. In addition, to impose liability for malicious prosecution on the United States, Plaintiffs must prove that the prosecution was the result of wrongful conduct by a law enforcement officer. 28 U.S.C. § 2680(h). EPA inspectors are not law enforcement officers under the FTCA. Accordingly, only the alleged malicious conduct of SA Creavin or SAC Hubbard can be the basis for imposing liability.

D. The Plaintiffs were investigated and prosecuted for violations of the Clean Water Act, 33 U.S.C. § 1251 et seq., which regulates discharges from industrial facilities. Under the Act, Congress requires that the EPA administrator publish regulations "establishing pretreatment standards" to prevent the discharge of any pollutant through a POTW that "interferes with, passes through or is otherwise incompatible with such works". *Id.* § 1317(b)(1). One such regulation bars the discharge of water into a POTW with a pH level lower than 5.0. 40 C.F.R. § 403.5(b)(2) (2004). Any person who knowingly violates those standards is subject to prosecution for a felony. 33 U.S.C. § 1319(c)(2)(A).

■ E. The first element of a malicious prosecution claim, institution of criminal process, is conceded by the government to have been met by the August 12, 1998 grand jury indictment of Plaintiff (98–cr–40022–NMG). Plaintiffs have, however, failed to meet their burden of proof that law enforcement officials lacked prob-

able cause or acted with malice in prosecuting the Plaintiffs.

F. Probable cause is defined as "a state of facts in the mind of the defendant as would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the plaintiff has committed a crime." *Zullo v. Town of Framingham*, 772 N.E.2d 1098 (Mass.App.Ct.2002)(internal citations omitted). Notwithstanding Plaintiff's more recent argument that any discharge at RMC of effluent below a pH of 5.0 at the time criminal proceedings were initiated was impossible, SA Creavin and SAC Hubbard believed that there had been discharges to the street below 5.0. Observations of the pretreatment system showed that it had not been fully operational during the October 21 and November 7, 1997 inspections. Statements of RMC employees confirmed that Knott was aware the pretreatment system was inoperative but that he chose to withhold the resources necessary for its repair.

G. There is no evidence that the investigation conducted by Inspectors Granz and Pimpare was conducted in bad faith nor to suggest that they had a motive to falsify test results or to fraudulently facilitate the prosecution of the Plaintiffs. Thus, their test results indicating discharges with pHs below 5.0 are supportive of the probable cause for the criminal charges.

H. This Court has already (twice) ruled that SA Creavin acted reasonably in relying upon the inspectors' reports of their observations. *See United States v. Knott*, No. 98-40022, Memorandum and Order of February 16, 1999, at 8-10 (declining to suppress evidence secured in the searches conducted pursuant to warrants); *Riverdale Mills Corp. v. United States*, 337 F.Supp.2d 247, 255-57 (D.Mass. 2004) (allowing summary judgment to Defen-

dants on the *Bivens* claims). He was not required to examine the actual logbooks nor to assume the report submitted to him by Pimpare might misrepresent data from the field.

I. Plaintiffs offered evidence at trial that they owned the street in front of Riverdale Mills as well as the 300 foot sewer line between Manhole # 1 and Manhole # 2. For the purpose of deciding Plaintiffs' claim for malicious prosecution, however, it is unnecessary to determine such ownership because the question is whether SA Creavin had a good faith basis for questioning Plaintiffs' ownership and thus concluding that the POTW began at Manhole # 1. There was evidence at trial that he had such a basis and belief and Plaintiffs' rebuttal of that evidence falls short of showing that the Defendants lacked probable cause for the indictment and prosecution of Plaintiffs.

J. Under Massachusetts law, Plaintiffs must also prove the presence of malice at the time criminal process was commenced. *Sklar v. Beth Israel Deaconess Medical Center*, 59 Mass.App.Ct. 550, 797 N.E.2d 381 (2003). Malice requires that "the accuser knew there was no probable cause for the commencement of the action, and that the accuser acted with an improper motive." *Gouin v. Gouin* 249 F.Supp.2d 62, 71 (D.Mass.2003). Even "wanton or negligent behavior is insufficient [to prove malice] without some evidence of an ulterior purpose." *Sklar*, 797 N.E.2d at 387. Thus, Plaintiffs were required to prove that SA Creavin or SAC Hubbard acted with an improper motive.

K. The evidence at trial falls far short of demonstrating that SA Creavin or SAC Hubbard acted with an improper motive. When the criminal investigation was opened and when the evidence was presented to a grand jury, SA Creavin knew that the pretreatment system was inopera-

**60**

tive, that Knott was of the opinion that it didn't matter and that both the civil inspectors and the technical team assisting at the November 7, 1997, search had found discharges with pHs below 5.0. There was no credible evidence that those findings were falsified.

L. The government is reproved for its sloppy recording of pH values in Inspector Granz's logbook and subsequent heavy-handed treatment of RMC, including the conduct of an unconsented and therefore unconstitutional search of the plant. That negligent conduct caused the Plaintiffs, a law enforcement agency and, ultimately, the taxpayers unnecessary expense. Notwithstanding this conclusion, however, SA Creavin was entitled to rely on the summary reports of EPA employees without looking at original field notes and there is no evidence that law enforcement officers acted with malice.

M. Discussion of the final element of malicious prosecution, termination of proceedings in favor of the Plaintiffs, is unnecessary because two other elements of the accused tort (malice and lack of probable cause) have not been proven. Accordingly, Plaintiffs claim for malicious prosecution fails.

### III. *Conclusion*

Plaintiffs have failed to meet their burden of showing that the Defendants lacked probable cause to initiate criminal proceedings under the Clean Water Act or to demonstrate that the Defendants acted maliciously with regard to that prosecution. Accordingly, the Plaintiffs have failed to prove their claim of malicious prosecution and judgment will enter for the Defendants.

So ordered.