PAUL N. CHERVIN vs. THE TRAVELERS INSURANCE COMPANY.

No. 04-P-1315.

Suffolk. May 12, 2005. - January 17, 2006.

Present: COWIN, BROWN, & MILLS, JJ.

Further appellate review granted, 446 Mass. 1105 (2006).

*Malicious Prosecution. Abuse of Process. Malice. Practice, Civil,* Summary judgment.

In an action for malicious prosecution and abuse of process, brought by a doctor (plaintiff) against a workers' compensation insurer (defendant) that had pursued an unsuccessful medical malpractice subrogation action against the plaintiff, this court affirmed the trial court's judgment in favor of the defendant, where the summary judgment record, although presenting a triable question on the issue whether the defendant had acted with probable cause in bringing the malpractice action [400-403], would not permit a finding that the defendant had acted with malice [403-405]. BROWN, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on August 27, 2001.

The case was heard by *Patrick F. Brady,* J., on a motion for summary judgment.

*Stanley W. Wheatley* for the plaintiff.

*Scott McConchie (Thomas F. Maffei* with him) for the defendant.

MILLS, J. After The Travelers Insurance Company (Travelers or the insurer), as a workers' compensation carrier, paid $775,000 in benefits to an injured worker, Edward Mosher (the employee), it commenced a medical malpractice subrogation action against Dr. Paul N. Chervin, a neurologist, on the theory that he may have been liable for the accident in which the employee sustained the injuries.[1] Travelers theorized that

---

[1]Dr. Howard Richter, who was the employee's primary care physician, was a codefendant.

Chervin had failed to take certain actions, including warning the employee of the dangers of drinking alcohol while taking Dilantin medication for his seizure disorder. After the insurer's complaint was dismissed, Chervin filed the instant action against the insurer and its attorney, Richard J. Sullivan, claiming that they acted maliciously and without probable cause in bringing the malpractice action against him.

A Superior Court judge allowed the defendants' motion for summary judgment, reasoning that Chervin had no reasonable likelihood of producing evidence to support counts of malicious prosecution, abuse of process, or violation of G. L. c. 93A. Addressing the malicious prosecution claim against the insurer, the judge ruled that the insurer clearly had probable cause to sue Chervin based upon the opinions offered to the insurer by a lawyer who considered suing Chervin on the employee's behalf. The judge also ruled that, because the insurer filed the subrogation action to recover money, rather than for some ulterior purpose, there was no basis for a finding that it acted with malice.[2] On the element of probable cause, we disagree with the judge that, in the circumstances of this case, the insurer's receipt of communications from counsel established probable cause as matter of law. We nevertheless affirm the judgment for the insurer, concluding that the facts contained in the summary judgment record would not permit a finding that the insurer acted with malice.

*The underlying facts.* The facts that appear from the summary judgment record, viewed in a light most favorable to Chervin, the nonmoving party, see *Wiedmann* v. *The Bradford Group, Inc.*, 444 Mass. 698, 708 (2005), are as follows. Chervin treated the employee in 1995 and 1996 relative to a seizure disorder. In July, 1996, over four months after Chervin had last seen him, the employee suffered a seizure while driving and became a quadriplegic as a result of an accident. After Travelers initially refused to pay the employee's claim, he brought it before the

[2]The judge ruled that the claims against Attorney Sullivan were lacking in the likelihood of proof. Chervin's appeal as to Sullivan was dismissed with prejudice by stipulation of the parties. The judge did not specifically address the c. 93A or abuse of process claims, or the favorable termination and damages components of malicious prosecution. In view of our disposition of the case, we need not discuss these issues.

Massachusetts Department of Industrial Accidents (DIA). Throughout that case, which lasted approximately two and one-half years, the insurer asserted as a defense that the employee's injuries were the result of his own misconduct in failing to follow the instructions of Chervin and Dr. Howard Richter, the employee's primary care physician, to take the Dilantin and to refrain from consuming alcoholic beverages.[3] In the DIA proceeding the employee was represented by Attorney Martin Schneider, and the insurer by Attorney Terrence Reilly. On April 22, 1999, Reilly reported to the insurer that the DIA case was tentatively settled, and that during the settlement negotiations, the possibility of a third party subrogation action against Chervin and Richter was discussed. In his report Reilly also stated:

> "The only outstanding issue is how Travelers will handle any lien . . . on the employee's potential third party malpractice claim against [the employee's] treating physicians. First, it should be noted that five attorneys who practice in the medical malpractice field have rejected the case. A sixth attorney is reviewing the case now. The statute of limitations runs in July.
>
> ". . .
>
> "I have suggested to . . . Schneider that I will recommend that the insurer agree to divide any proceeds from the prospective litigation equally among [the employee], the attorney handling the case, and the insurer. This agreement would be conditioned on the employee agreeing that the insurer has a valid lien. I recommend this course of action because: a) I do not think that the third party claim is viable in the first place; b) it will be important that the insurer structure the third party suit in a way that will

---

[3]As part of its case at the DIA, the insurer retained two medical experts who opined that the employee's accident resulted from his noncompliance with the doctors' instructions to take Dilantin and avoid alcohol. At least one of these opinions became part of the employee's records, which were, as will be discussed below, reviewed by the insurer's employees who made the decision to file the action against Chervin. Those decision makers did not otherwise have access to or knowledge of the record of proceedings before the DIA.

maximize the interest and cooperation of [the employee] (an economic incentive is most effective)[;] and c) while I do not think that the employee has a chance to succeed in a third party action, if he were to succeed, a settlement or judgment would be substantial enough in light of the potential damages that the insurer should recover much of its lien."

Settlement was finalized at the end of May, 1999, and included a lump sum payment of $775,000 to the employee as well as an agreement for division of the proceeds of the possible subrogation action equally between the insurer, the employee, and counsel. On or about June 16, 1999, Reilly reported that Schneider "has finally found a law office that is willing to prosecute the [malpractice] case. However, . . . [the employee] has decided that he does not want to pursue [it]." On June 18, 1999, Travelers employee Teresa Pacheco was instructed to investigate the case for "possible subrogation," i.e., whether the insurer would file, in the employee's name, a subrogation medical malpractice action against Chervin. Pacheco's work began on June 24, 1999.[4] Her investigation included review of the insurer's claim file[5] and the employee's medical records, as well as conversations, limited in number and content, with Reilly, Schneider, and an Attorney Abrahams, with whom she had no previous contact nor information as to training, background, or experience.

When assigned to investigate, Pacheco was instructed to

---

[4]Pacheco worked in the insurer's subrogation unit in Fall River, which was completely separate from the claims department (which had managed Travelers's defense in the DIA case). She was not trained as an investigator, and had no experience with malpractice actions or familiarity with this case, which was the highest dollar value case she had ever been assigned.

[5]From July 11, 1996, two days after the accident, and for all time thereafter relevant to this case, the insurer maintained computerized claim notes which contain a description of daily activity by Travelers personnel with respect to the employee's claim, as well as investigation and commencement of the malpractice action. The claim notes did not contain recitation or records of the proceeding before the DIA. In our review of the summary judgment record, knowledge of the computerized claim file is attributed to the Travelers employees who made the decision to sue Chervin. As a general rule, information, including witness testimony, from the DIA proceedings is not so attributed. When the insurer has, in its statement of facts or arguments, made reference to such testimony, we disregard it in evaluating the decision makers' actions.

review Reilly's April 22, 1999, memo, and to contact him. She did both, and on June 30, 1999, telephoned Reilly for her only conversation with him concerning the case.[6] Reilly reiterated that Schneider had "found someone to take [the employee's] med mal claim but [the employee] has elected not to pursue." Reilly further commented to Pacheco, in contrast to his April 22, 1999, memo, that Travelers "should really think about pursuing [the] claim . . . [and that] he feels based on Dr. Richter's testimony at the hearing that Dr. Chervin had some responsibility to his patient taking into consideration the alcohol abuse." When Pacheco asked Reilly why it took six attorneys to review the claim before one decided to take it, and why the employee was not pursuing it, he referred her to Schneider.

The next day, July 1, 1999, Pacheco called and spoke with Schneider, who reported that (1) he had six attorneys look at the claim; (2) the first four rejected the claim because they concluded that a jury would not believe that the incident would not have occurred even if the doctors had intervened correctly; (3) two attorneys believed the claim viable, but one would not handle it because of the employee's ambivalence; (4) he, Schneider, "feels strong about [the] claim"; (5) there are certain protocols doctors must go through when faced with a patient who has an addiction; (6) he understood that the employee's cooperation would be necessary to go forward with the claim but "feels . . . that he will be able to talk . . . [the employee] into cooperating"[7]; and (7) he, Schneider, would cooperate in

---

[6]Pacheco and Reilly spoke only briefly, and only once. While Reilly testified in his deposition that he "would be a conduit of an enormous amount of information, as well as more than a year of investigation and having read and reread every single record and interviewed every single witness," and expected that he would be required to provide this information to the insurer's decision makers, the claim notes reflect no such conversations or information. He never spoke to Pacheco again, nor directly or indirectly with the personnel responsible for deciding to file a medical malpractice complaint. Pacheco's deposition testimony suggests that she received no follow up from Reilly subsequent to the one brief telephone conversation.

[7]Schneider also informed Pacheco that the employee lived with his "85 year old mother and [the employee's] house is in the process of being made handicap accessible and [that the employee's] wife has a rotating schedule [at her work] and cannot take care of [the employee]." Finally, Schneider stated

the pursuit of the claim. Schneider identified the willing attorney as Abrahams.[8]

On July 1, 1999, Pacheco also had her only telephone conversation with Abrahams. Pacheco did not know Abrahams or anything about her, except that she was the sixth attorney who had been asked by Schneider to evaluate the file and "take the claim." Abrahams was unknown to anyone else at Travelers and the insurer had no information as to Abrahams's experience, if any, in medical malpractice cases. In this conversation Abrahams reported that (1) she had had discussions on a preliminary basis with an expert (without identifying the expert's credentials); (2) certain protocols should have been taken, and were not ("detox," license revocation, and family involvement); (3) she had met with the employee, who told her that if his license had been taken away he would not have driven; (4) she was willing to take the claim with a forty percent fee and "up front" expenses; and (5) the insurer's chances for success were "slightly over fifty percent."

On July 2, 1999, Pacheco reported the results of her investigation to her supervisor, Maureen Bolger. Bolger recorded the following in the claim file: "Atty Linda Abr[ah]ams feels that there is potential relative to a medical malpractice claim. It is my understanding that the atty feels the doctor deviated from the standard of care relative to following protocol in view of employee's alcohol consumption while taking Dilantin, driving. Atty indicated proper protocol would have been family intervention relative to alcohol, notifying R[egistry of] M[otor] V[ehicles] of Dilantin so that license would be suspended."

Before speaking with Abrahams, Bolger conferred with her supervisor, Ted Moscala, and "[b]ased on the paids," they "agreed that we should go ahead and file suit."[9] Later, on July 7, 1999, Bolger recorded that "[a]fter telephone conversations

that he "feels that [the employee] would make an ok witness[,] but right now he is very angry."

[8]On June 30, 1999, Reilly reported to Travelers (and his report is contained in the claim notes available to Pacheco) that Schneider had represented to him that "the attorneys have already consulted with an internist who would render an opinion supporting the claim."

[9]Bolger testified that she and Moscala made the decision on behalf of the insurer to proceed with the action.

w/counsel Linda Abr[ah]ams and discussion" with Moscala, "we have opted to go forward w/the filing of the complaint against Dr. Richter and Dr. Chervin." It was further agreed that Abrahams would prepare the complaint, and that Sullivan would sign and file it, but delay service until review by a medical expert and receipt of an opinion supporting the claim.

On July 8, 1999, Sullivan, acting as the insurer's lawyer, signed a complaint, drafted by Abrahams in the employee's name, and filed it with the Superior Court. The insurer never obtained an expert opinion but, nevertheless, abandoned its initial plan and served the complaint anyway. At the time the action was commenced, no one from Travelers had consulted with a doctor. After procedural skirmishes, including the employee's continued refusal to cooperate by signing interrogatory answers, on February 1, 2001, default judgment entered for Chervin with costs.

Other details from the summary judgment record will be included in our discussion as appropriate.

*Discussion.* 1. *Probable cause.* An "action for malicious prosecution lies for abuse of civil as well as criminal process." *Rosenblum* v. *Ginis*, 297 Mass. 493, 497 (1937). See *Hubbard* v. *Beatty & Hyde, Inc.*, 343 Mass. 258, 260-261 (1961). The essence of the tort is interference with "the right to be free from unjustifiable litigation." *Adams* v. *Liberty Mut. Ins. Co.*, 60 Mass. App. Ct. 55, 68 (2003), quoting from *Carroll* v. *Gillespie*, 14 Mass. App. Ct. 12, 18 (1982). "To assert a proper claim of malicious prosecution, the [plaintiff] must plead facts that demonstrate . . . damage[] because [the underlying civil action was filed both] with malice and without probable cause, and that the . . . action terminated in [the plaintiff's] favor." *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593 (1982).

Probable cause is treated significantly differently in malicious prosecution cases stemming from civil rather than criminal proceedings. The case law is clear that "less in the way of grounds for belief will be required to justify a reasonable man in bringing a civil rather than a criminal [proceeding]. . . . All that is necessary, where civil proceedings are involved, is that the [party filing suit] 'reasonably believe that there is a chance that his claim may be held valid upon adjudication.' " *Bednarz*

v. *Bednarz*, 27 Mass. App. Ct. 668, 672 (1989), quoting from *Hubbard* v. *Beatty & Hyde, Inc.*, 343 Mass. at 261, 262. See Restatement (Second) of Torts § 675 comment e (1977). Thus, it has been emphasized that "the plaintiff [in a malicious prosecution action] has the difficult burden of proving a negative fact, that is want of probable cause." *Bednarz* v. *Bednarz*, *supra* at 673.[10] "[T]he defendant's conduct in bringing a civil action . . . 'must be judged by his honest and reasonable belief at the time he instituted the [civil action] rather than by what may turn out later to have been the actual state of things.' " *Id.* at 672, quoting from *Muniz* v. *Mehlman*, 327 Mass. 353, 359 (1951).

As to probable cause in the instant matter, the insurer's conduct in commencing the action must be judged by whether Bolger and Moscala, the decision makers, had an honest and reasonable belief in the validity of the claim at the time of the decision to file suit against Chervin. See *Seelig* v. *Harvard Coop. Soc.*, 355 Mass. 532, 541 (1969) ("Probable cause is a state of mind. A corporation has no mind. While it can be responsible for . . . tortious acts . . . committed by an employee, the requisite state of mind must necessarily be that of the employee"). The summary judgment record shows that Moscala knew only what Bolger told him, and that Bolger knew what Pacheco had told her, plus Bolger's own review of the claim file and one telephone conversation with Abrahams.

From the records, they knew that the employee had been treated by Chervin, who had prescribed Dilantin, and that some four months after the employee had last seen Chervin, the employee had been drinking alcohol, with Dilantin in his system, at the time of the accident resulting in his injuries. They knew that the insurer had paid $775,000, and that the attorneys were looking for a source to recoup some or all of that payment, and were evaluating the medical malpractice case against Chervin in that regard.

---

[10]This is in contrast to the standards for malicious prosecution of criminal matters, where it has been held that evidence of recklessness creates a jury question on probable cause. See *Carroll* v. *Gillespie*, 14 Mass. App. Ct. at 24-25. See also 1 Harper, James & Gray, The Law of Torts § 4.8 (3d ed. 1996) (explaining how the civil standard is distinct from the criminal standard); Restatement (Second) of Torts § 675 comment d (1977).

Bolger and Moscala knew that the employee had consistently refused to cooperate, but also had received assurances from his attorney, Schneider, that he could "talk [the employee] into cooperating" eventually. They knew that the employee's cooperation would be essential to the case.

They knew that Reilly, as the insurer's DIA attorney, was familiar with the case and that in April he had reported that he did not believe the claim viable. They knew that he had changed his position two months later, based upon discussions with Schneider.

They had reason to believe that Schneider was familiar with the DIA case, had a financial interest in the potential malpractice case, and, while adverse to the insurer's interests in the DIA case, had become allied with it in the agreement to divide proceeds if the malpractice action were successful. They had not met Schneider, knew little about his background, and knew nothing as to his familiarity with malpractice matters.

Bolger and Moscala knew that five medical malpractice lawyers had refused the case and that there was no identified medical expert to support the claim of malpractice. They knew that the sixth, Abrahams, had been referred by Schneider. They had not met Abrahams, knew nothing about her experience, and had heard only that she had talked to the employee, discussed the case with an unidentified expert, and reported an opinion that the insurer had slightly over a fifty percent chance of success. They knew that Abrahams was located at the last minute in an attempt to file a civil complaint before the statute of limitations expired. Thus, the insurer essentially based its decision in this case upon communications from three lawyers: Reilly, Schneider, and Abrahams.

Pacheco's lack of knowledge about medical malpractice actions did not concern her, she explained, "since there [were] attorneys who believed that there was a claim." Bolger testified that "[t]o make a decision to file a claim is based on counsel's opinion." The judge below included in his rationale that an "attorney retained by [the employee] expressed an optimistic view of the chances of success on a medical malpractice claim . . . ." These statements echo the advice-of-counsel defense pleaded

by the insurer.[11] However, on this record, at least three elements of that defense remain open factual questions, which, we conclude, are highly relevant in determining the reasonableness of the insurer's decision to file suit. As to the reliance on Abrahams's advice, see note 11, *supra*, elements (b), (d), and (f). The record shows that the insurer did not fully provide all material facts within its knowledge to her, nor is there any evidence that she was competent or of such training and expertise that she was able to exercise prudent judgment in the matter. The summary judgment record also left open the reasonableness of the insurer's reliance on Schneider's advice as to the likely cooperation of the employee. We hold, therefore, that the summary judgment record presented a triable question on the issue of probable cause.

2. *The malice element.* Although we have concluded that there remained a triable issue on the element of probable cause, we determine, on our view of the record, that a fact finder could not reasonably conclude that the insurer acted with an improper purpose or motive as required by our case law. See *Beecy* v. *Pucciarelli*, 387 Mass. at 594 n.9 ("an improper motive is essential"); *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 100 (1987); *O'Connell* v. *Bank of Boston*, 37 Mass. App. Ct. 416, 420 (1994).

In order to prove malice, the plaintiff must show that the defendant was " 'attempting to achieve an unlawful end or a lawful end through unlawful means,' or intended to harass, vex, or annoy [the person sued]. . . . Wanton or negligent behavior is insufficient without some evidence of an ulterior purpose." *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. 550, 557 (2003), quoting from *Beecy* v. *Pucciarelli*, 387 Mass.

---

[11]A party raising an advice-of-counsel defense must show that (a) it was "acting in good faith in the belief that [it had] good cause for [its] action and [was] not seeking an opinion in order to shelter [itself]"; (b) it "made a full and honest disclosure [to counsel] of all the material facts within [its] knowledge or belief"; (c) it was "doubtful of [its] legal rights"; (d) it had "reason to know that [its] counsel [was] competent"; (e) it "honestly complied with [its] counsel's advice"; and (f) its counsel was "of such training and experience that he [was] able to exercise prudent judgment in such matters." *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 275 (1991). See Restatement (Second) of Torts §§ 666(1), 675 comment g (1977).

at 594 n.9, and citing *id.* at 594; *O'Connell* v. *Bank of Boston*, *supra* at 420.

Chervin posits that the element of malice may be inferred from (1) evidence suggesting that a significant motivation for the insurer's filing suit was the amount of "the paids"; and (2) evidence supporting the conclusion that the insurer was aware that its claim was not meritorious. In our view, as matter of law, this evidence, while supporting a lack of probable cause, does not sufficiently support an inference of malice.

There was nothing fundamentally improper in the insurer's consideration of the size of its potential recovery in deciding whether to file suit. The decision to file any civil suit is almost always a function of the amount at stake as well as the chances of success. There appears to be no evidence of any incentive or accounting benefit to Travelers that would have made it advantageous to file suit separate and apart from the goal of trying to recover the money. If there were such evidence, that would make a difference to us; but, without more, deciding to sue because of the size of "the paids" does not establish that the insurer was acting "primarily for a purpose other than that of properly adjudicating [its] claims." *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.,* 410 Mass. 262, 273 (1991), citing Restatement (Second) of Torts § 674(a) (1977).

The strength of the insurer's belief that the case had merit does not bear directly upon the malice element, but goes more to the separate element of probable cause. While a lack of probable cause may give rise to an inference of malice, that is true only when probable cause is so obviously lacking that the "logical inference is that the prosecution resulted not from an error, but from malice." *Beecy* v. *Pucciarelli, supra* at 594, quoting from Mallen & Levit, Legal Malpractice § 59, at 124 (2d ed. 1981). Here, as previously discussed in connection with lack of probable cause, the evidence permits the conclusion that the insurer placed the case into suit based upon weak and unsubstantiated assurances from the various lawyers as to the merits of the claim and the likelihood that the employee would cooperate. Even if the decision to file suit was reckless, however, this conduct was not enough to give rise to an inference of malice. When a malicious prosecution case stems from

the institution of a civil matter, on a motion for summary judgment, the test for inferring malice from a lack of probable cause is "whether the record produces a genuine issue of material fact [that the party initiating suit] *knew* or *believed* that [its information] was 'so flawed or superficial that it provided *no* reasonable basis' for thinking [that suit was warranted]" (emphasis supplied). *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. at 558, quoting from *O'Connell* v. *Bank of Boston*, 37 Mass. App. Ct. at 420. This exacting standard has not been met.

Accordingly, the judgment dismissing the plaintiff's complaint is affirmed.

*So ordered.*

BROWN, J. (dissenting). Upon being admitted to practice law in this Commonwealth, attorneys take an oath that they shall "not wittingly or willingly promote or sue any false, groundless or unlawful suit, nor give aid or consent to the same; [and] will delay no man for lucre or malice . . . ." G. L. c. 221, § 38. See St. 1701-2, c. 7, § 2. All too often attorneys (old and new) have to be reminded that this oath should not merely be uttered at the initial ceremony, and forgotten as soon as the registration book is signed.

The insurer's conduct in commencing this action inevitably leads to the proverbial quandary — what did it and its agents know and when did they know it? See *Bednarz* v. *Bednarz*, 27 Mass. App. Ct. 668, 672 (1989). While I agree with the majority that there remains a triable issue whether Travelers brought suit against Dr. Chervin without probable cause, I also conclude that the summary judgment record is adequate for Chervin to withstand Travelers's motion on the elements of malice, favorable termination, and damages. I therefore respectfully dissent.

1. *Malice.* I am of opinion that on this record a fact finder could reasonably find that the insurer acted with an improper motive, as well as knowing that there was no probable cause.

"To raise a genuine issue of material fact on the question of malice, the plaintiff must come forward with some

65 Mass. App. Ct. 394 (2006)

Chervin v. The Travelers Insurance Company.

evidence that would permit a fact finder to conclude that [the defendant] (1) knew there was no probable cause, and (2) acted with an improper motive, . . . i.e., acted 'primarily for a purpose other than that of properly adjudicating' the claim. *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 273 (1991). . . . More specifically, the plaintiff must show that [the defendant] was 'attempting to achieve an unlawful end or a lawful end through unlawful means,' or intended to harass, vex or annoy [him]. *Beecy* v. *Pucciarelli*, [387 Mass. 589,] 594 n.9 [1982]. Wanton or negligent behavior is insufficient without some evidence of an ulterior purpose."

*Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. 550, 557 (2003). "[T]o do a wrong and unlawful act knowing it to be such, constitutes legal malice." *Wills* v. *Noyes*, 12 Pick. 324, 328 (1832).

"The malice necessary to be shown in order to maintain this [malicious prosecution] action, is not necessarily revenge or other base and malignant passion. Whatever is done wilfully and purposely, if it be at the same time wrong and unlawful, and that known to the party, is in legal contemplation malicious."

*Beecy* v. *Pucciarelli*, 387 Mass. at 594 n.9, quoting from *Wills* v. *Noyes*, *supra* at 327-328.

The judge commented that it was not uncommon or fundamentally unfair for the insurer to have filed the action notwithstanding the absence of a malpractice opinion necessary for ultimate success. Even accepting that view, which I find somewhat problematic, a fact finder could fairly conclude that the insurer knew that it unambiguously lacked an absolutely necessary component for this malpractice action, i.e., a cooperating employee. Bolger and Moscala were aware that the employee had consistently refused to cooperate, despite Attorney Schneider's feeling that he could "talk [the employee] into cooperating" eventually. They knew full well that the employee's cooperation would be essential to the case. A fact finder could thus conclude that commencement of the action, with knowledge that a necessary component would not be forthcoming, was the commencement of an action not for proper

adjudication of the claim, but rather, as Chervin argues, for forcing a settlement by professional embarrassment of a medical doctor by the commencement of a medical malpractice action against him. See Restatement (Second) of Torts § 676 comment c (1977). I am satisfied that Chervin presented sufficient evidence on the question of malice.

2. *Favorable termination.* The malpractice action was dismissed because the employee refused to sign interrogatory answers. The insurer, arguing that this is a mere technical or procedural defect that should not constitute a favorable termination, relies upon *Wynne* v. *Rosen*, 391 Mass. 797, 801 (1984). Chervin cites the same case for authority that the default judgment was a favorable termination that, in the circumstances, reasonably shows the termination as consistent with his nonculpability in the underlying case.[1] See *id.* at 800-801.

I think that Chervin presented sufficient evidence for a fact finder to conclude that Travelers commenced the underlying action knowing that it did not have the necessary components for the prosecution of its case, i.e., a cooperating plaintiff-employee and an identified medical expert.[2] The immediate basis for the dismissal was the lack of the plaintiff-employee component, known by Travelers to have been missing, ab initio.

I am of opinion from my reading of *Wynne*, and Chervin's argument, that if the rule were otherwise, anyone could file a lawsuit with malice and without probable cause and then escape all liability simply by defaulting on discovery after the damage was already done. The default judgment in this case was a favorable termination for purposes of this malicious prosecution

[1]The underlying case in *Wynne* v. *Rosen* was a criminal case that was abandoned by the prosecutor. The court held, essentially, that for purposes of maintaining a civil action for malicious prosecution, the underlying criminal prosecution is deemed to have terminated in favor of the defendant when the prosecutor formally abandons the proceeding either by entering a nolle prosequi or by moving for a dismissal, *provided that the circumstances of the abandonment compel an inference that reasonable grounds to pursue the prosecution were lacking.* That court further held that the reasons stated for the abandonment must be consistent with the innocence of the accused. 391 Mass. at 800-801.

[2]Bolger and Moscala knew that five medical malpractice lawyers had refused the case and that "there was no identified medical expert to support the claim of malpractice."

action, not the result of a mere procedural or technical defect. See *Noel* v. *Plymouth*, 895 F. Supp. 346, 355 (D. Mass. 1995).

3. *Damages*. The insurer argues that Chervin has not established causation or the amount of damages, and that on this basis alone his action was properly dismissed. I disagree. The commencement of a malpractice action against a physician is, in my view, a "statement[] that may prejudice the [individual's] profession or business." *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 630 (2003). Mental suffering, distress, harassment, and "much inconvenience" are recognized, for damage purposes, if caused by the alleged abuse of process. *American Velodur Metal, Inc.* v. *Schinabeck*, 20 Mass. App. Ct. 460, 470 (1985). See *Malone* v. *Belcher*, 216 Mass. 209, 212 (1913); *Titcomb* v. *Bay State Grocery Co.*, 254 Mass. 599, 601 (1926). The malpractice complaint was a public record and Chervin was required to disclose it to State licensing boards, hospitals, physician associations, and insurers.

I would reverse the judgment dismissing the complaint and remand the matter for further proceedings.