PAUL N. CHERVIN *vs.* THE TRAVELERS INSURANCE COMPANY
& another.[1]

Suffolk. November 6, 2006. - December 26, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Malicious Prosecution. Subrogation. Malice. Practice, Civil,* Summary judgment. *Consumer Protection Act,* Businessman's claim.

In a civil action for malicious prosecution brought by a doctor against an insurance company that had unsuccessfully pursued a medical malpractice subrogation action against the plaintiff, a Superior Court judge improperly granted summary judgment in favor of the defendant, where the plaintiff offered sufficient evidence to raise a genuine and material factual dispute concerning whether the defendant (in the persons of its decision makers) reasonably believed that a sound chance existed that the medical malpractice claim might be held valid on adjudication [102-107]; where the materials before the judge raised jury issues as to whether the defendant was motivated to file the subrogation action by an improper purpose according to the formulation in the Restatement (Second) of Torts § 676 (1979) [107-111]; where the plaintiff satisfied his burden of demonstrating that the subrogation action had terminated in his favor [111-112]; and where the record demonstrated genuine issues of material fact on the plaintiff's damages [112].

Dismissal of a G. L. c. 93A claim was proper where the plaintiff bringing the claim — a doctor who successfully defeated a medical malpractice subrogation action brought by the defendant insurer — could not establish that he had any relevant business transaction with the defendant that would serve as the predicate for liability under that statute. [112-113]

CIVIL ACTION commenced in the Superior Court Department on August 27, 2001.

The case was heard by *Patrick F. Brady,* J., on a motion for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Stanley W. Wheatley* for the plaintiff.

*Thomas F. Maffei (Scott McConchie* with him) for The Travelers Insurance Company.

---

[1]Richard J. Sullivan.

GREANEY, J. The background of this appeal, in brief outline, is as follows. The Travelers Insurance Company (defendant) paid a lump-sum settlement of $775,000 on the workers' compensation claim of Edward Mosher, and then commenced a medical malpractice subrogation action under G. L. c. 152, § 15, against Paul N. Chervin (plaintiff), a neurologist, claiming that he failed to render appropriate medical care to Mosher, thereby making him liable for the accident in which Mosher was seriously injured. The subrogation action concluded with a judgment in the plaintiff's favor (dismissed with costs), and he then commenced this action against the defendant and its attorney Richard J. Sullivan, claiming that their actions in filing the medical malpractice subrogation action constituted malicious prosecution, abuse of process, and a violation of G. L. c. 93A, §§ 2 and 11. A judge in the Superior Court granted the defendants' motions for summary judgment. The plaintiff appealed from the termination of his malicious prosecution and G. L. c. 93A claims.[2] The Appeals Court, in a divided decision, upheld the summary judgment on the malicious prosecution claim and concluded that it was unnecessary to address the G. L. c. 93A claim. *Chervin* v. *Travelers Ins. Co.*, 65 Mass. App. Ct. 394, 395 n.2, 405 (2006). We granted the plaintiff's application for further appellate review. We reverse the judgment on the malicious prosecution claim and affirm the judgment on the G. L. c. 93A claim.

Because the case is one of summary judgment, we summarize the facts in the light most favorable to the nonmoving party, the plaintiff. *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 263 (1991), and cases cited. In July, 1995, Dr. Howard Richter, a primary care physician, referred his patient, Mosher, who had suffered a seizure, to the plaintiff for neurological evaluation and treatment. The plaintiff saw Mosher on several occasions between August, 1995, and February, 1996. On July 9, 1996, over four months after his last visit to the plaintiff, Mosher, who was working, was involved in a single-vehicle automobile accident that left him a quadriplegic.

---

[2]The plaintiff's appeal as to the defendant Richard J. Sullivan was dismissed with prejudice by stipulation. The plaintiff abandoned the abuse of process claim.

The defendant was the workers' compensation insurer for Mosher's employer. After the defendant denied Mosher's claim for workers' compensation benefits, Mosher commenced a proceeding at the Department of Industrial Accidents. Mosher was represented by attorney Martin Schneider. The defendant was represented by Terrance Reilly, an attorney employed by it.

The workers' compensation proceedings lasted over two years. Throughout that time, the defendant argued that Mosher's injuries were not work related because the accident had occurred on his way to a medical appointment, and it asserted a defense under G. L. c. 152, § 27, claiming that Mosher's injuries were the result of his own wilful misconduct in failing to follow Richter's, and the plaintiff's, instructions to take Dilantin (an antiseizure medication) and not consume alcoholic beverages.[3] In support of its § 27 defense, the defendant obtained an expert opinion from a neurologist that stated:

> "Having reviewed the available medical records regarding Edward Mosher at your request, he has quite a significant history of alcohol abuse to an estimated six bottles of whiskey per week, as much as a gallon a day over weekends. . . . An addendum to his history and physical dated July 9, 1996 indicates that according to his wife, he was a heavy, heavy alcohol user with frequent seizures related to the alcohol use. The day of the accident was his first day back at work after heavy alcohol use for a week while on vacation. In these regards, it seems a distinct probability that his accident was not work related, instead due to a pre-existing seizure disorder for which he was noncompliant with medication, with recent alcohol use probably contributing . . . ."

The defendant obtained a second opinion from a different neurologist:

> "In summary, Mr. Mosher's motor vehicle accident of

---

[3] One of the defendant's expert's explained: "The use of alcohol may precipitate seizures in an individual with a seizure disorder. Additionally, the use of alcohol makes control of Dilantin levels difficult since chronic use may lower Dilantin levels, whereas acute alcohol use may result in a rise in Dilantin levels."

7/9/96 was due to his noncompliance with medication instructions to use Dilantin, and physician instructions to avoid alcohol, resulting in a seizure. . . . If Mr. Mosher had been compliant with his medication, and had followed instructions regarding abstinence from alcohol, it is my opinion, within reasonable medical certainty, that his seizure disorder would have been well controlled, and that the motor vehicle accident, and related injuries would not have occurred."

In April, 1999, the defendant and Mosher were engaged in settlement negotiations.[4] Schneider raised the possibility of a third-party medical malpractice action against Richter and the plaintiff. On April 22, 1999, Reilly sent a memorandum to the defendant's workers' compensation case manager, Dennis Dunn, concerning settlement and any lien the defendant might acquire with respect to a possible third-party claim. In that memorandum, Reilly informed Dunn that "five attorneys who practice in the medical malpractice field have rejected the case." Reilly stated, "I do not think that the third party claim is viable in the first place." Reilly also stated, "I do not think that the employee has a chance to succeed in a third party action."

In May, 1999, the defendant settled Mosher's workers' compensation claim for $775,000. On June 15, 1999, Schneider informed Reilly that he "finally" had found an attorney, Linda Abrahams, willing to take the third-party claim, but that Mosher did not want to pursue it. Reilly notified Dunn of these developments, advising him that the statute of limitations would run on July 8, 1999, and that the defendant could bring a subrogation claim in Mosher's name.

The defendant transferred the file from Dunn to Teresa

---

[4]In the workers' compensation proceedings, Mosher, apparently, had denied that he had been injured on his way to a medical appointment and asserted that he had been on his way to a warehouse to obtain a tool. The defendant's experts reviewed Mosher's medical records from his hospital admission after the automobile accident. The records indicated that Mosher's Dilantin level on admission was negligible. With respect to Mosher's alcohol levels, one expert noted the hospital records that reported that "his alcohol level was less than ten." The expert stated, "I do not see the specific laboratory report that indicates this, so I do not know the units in which the alcohol level was measured, to determine whether it was undetectable or whether he was intoxicated."

Pacheco, a claim representative in its subrogation unit. Pacheco reviewed the medical records (but nothing else) in the defendant's workers' compensation file on Mosher, and read the computerized claim notes (which included references to the § 27 defense and the text of Reilly's April 22, 1999, memorandum to Dunn). Pacheco spoke with Dunn, who referred her to Reilly, who, in turn, referred her to Schneider. On July 1, 1999, Pacheco spoke with Schneider. Schneider stated that he had had six lawyers review Mosher's case for possible medical malpractice. Four of the lawyers expressed their opinions that, even if Mosher's doctors had intervened correctly, the accident still would have occurred, and another lawyer rejected the case because of Mosher's lack of cooperation. Pacheco told Schneider that, if the defendant went forward with the third-party action, it would need Mosher's involvement. Schneider told Pacheco that Mosher did not want to pursue the claim at that time, but that Schneider felt he would "be able to talk him into cooperating" in the future.

Pacheco then spoke with Abrahams. Pacheco had never heard of Abrahams and knew nothing about her background or whether she was qualified to evaluate a medical malpractice claim. According to Pacheco's claim notes, Abrahams told Pacheco that she had discussed the claim with an "expert" on a "preliminary basis" and the expert stated that "certain protocols should have been taken (detox, revoke license and family involvement) and this was not done." Abrahams did not identify the expert for Pacheco or state the expert's qualifications or information on which the expert relied. Abrahams opined that the defendant's chances of success on a medical malpractice claim were slightly over fifty per cent.

Another employee in the subrogation unit, Maureen Bolger, also reviewed the claim notes in the file and spoke with Pacheco, who told her that Abrahams had said the case had merit. Bolger understood Abrahams to have expertise in medical malpractice claims.[5] On July 6, 1999, after discussions with the defendant's regional manager of subrogation, Ted Moscala, Bolger and Moscala made the decision to file the medical

---

[5]Although the plaintiff argued to the contrary, he produced no evidence to dispute this fact.

malpractice suit. According to Bolger's claim note, the decision to sue was "based on the paids," namely, the large settlement amount paid to Mosher. In her deposition, however, Bolger stated that the decision to file the medical malpractice action against the plaintiff "was based on what had developed in the file." Also according to Bolger's claim note, Bolger and Moscala sought to engage counsel (Abrahams) on a basis that would allow the defendant to abandon the claim at any time. They envisioned that Abrahams would work with one of the defendant's subrogation panel lawyers, Richard J. Sullivan, in a cocounsel arrangement.

The next day, Bolger made contact with Sullivan. Sullivan specifically asked Abrahams what should be done in light of the facts that the defendant lacked an expert opinion and the statute of limitations was about to run. Abrahams told Sullivan that it was her practice in these circumstances to file the complaint, but to withhold service until she obtained an expert opinion. According to Bolger's claim note, Sullivan then called Bolger, and they decided to go ahead. Bolger's claim note entry states: "Counsel will forward records for a review by an[] expert and if opinion is favorable, we will serve complaint."

On July 8, 1999, the defendant filed a complaint in Mosher's name against the plaintiff and Richter in the Superior Court. The complaint was drafted by Abrahams, but signed and filed by Sullivan. Abrahams declined the cocounsel arrangement. The defendant never obtained an expert willing to give an opinion in support of the claim. The defendant, however, served the complaint.

After the medical malpractice action was filed, the defendant assigned the case to Karla Walsh, a more experienced subrogation claim representative. Between March 23, 2000, and January 30, 2001, Walsh generated a series of entries in the claim notes including the following:

> "He [Sullivan] said we need to further discuss our options as there are prob[lems] with the case. We will need an expert for the tribunal. Also our theory of liab[ility] is speculative and we do not have Mr. Mosher on board — at this point he does not want to cooperate.

> "He [Sullivan] said [Mosher] does not want to partici-
> pate and still does not want to be involved with the case
> and without him it is a tough case. Even with him it is a
> tough case on liability. . . .
>
> "No cooperation from [Mosher] — without him [we]
> do not have much chance of any recovery.
>
> "Counsel is recommending that we dismiss our action
> for med-mal on this case. He does not feel it will succeed
> because of [Mosher's] unwillingness to participate in the
> litigation as well as the allegations of negligence against
> Mr. Mosher's doctors would be difficult to prove. . . .
> Counsel feels that some juries would take a puritanical at-
> titude toward the alcohol abuse and noncompliance of
> medical attn (not taking medication). It will be hard to
> persuade the jury that the doctors' negligence exceeds that
> of Mr. Mosher. Our own medical review concludes the
> cause of the accident was Mr. Mosher's non-compliance
> with dr's instructions."

On February 2, 2001, the claim was reviewed by Ellen Emory
of the defendant's major case unit. She made the following
claim note entry:

> "Agree that successful pursuit of medical malpractice
> claim is iffy at best and non-cooperation of [Mosher] rules
> out likelihood of successful recovery. Subrogation should
> be closed."

All of the claim note entries made subsequent to the filing of
the medical malpractice action were based on the same informa-
tion the defendant had before it filed the action.

Mosher refused to cooperate throughout, and the defendant
was not able to obtain his signature on answers to interrogatories.
In response to an application under Mass. R. Civ. P. 33 (a), as
appearing in 368 Mass. 906 (1976), a Superior Court judge
entered judgment for the plaintiff with costs on February 1,
2001. Prior to the entry of judgment, the defendant did not file
a motion to amend the complaint to substitute itself as the
plaintiff in the action. The case was never sent for consideration
to a medical malpractice tribunal.

The plaintiff was required to disclose the pending medical malpractice suit to State licensing authorities, hospitals where he had privileges, physician associations of which he was a member, and health insurers who provided coverage for his patients. After the medical malpractice action was filed, the plaintiff experienced a loss of referrals from other doctors. The plaintiff's reputation was damaged. He also did not secure a part-time position at the University of Vermont. In connection with this employment opportunity, the plaintiff was required to disclose the suit, which resulted in additional scrutiny and delay in connection with obtaining his Vermont medical license. The attorney's fees and costs incurred in defending the medical malpractice claim against the plaintiff were in excess of $6,700.

On August 27, 2001, the plaintiff filed this action. The defendant moved for summary judgment on the plaintiff's amended complaint. In allowing the motion, the judge concluded, with respect to the malicious prosecution claim, that the defendant had probable cause to sue the plaintiff based on Abrahams's statements that she had consulted with an expert who supported the medical malpractice action against the plaintiff. The judge also determined that, because the defendant only filed the subrogation action to recover money, either by judgment or settlement, there was no basis for finding that the defendant had acted with malice or an ulterior purpose. The judge did not specifically address the G. L. c. 93A claim, but stated generally that the plaintiff had "no reasonable likelihood of producing evidence to support counts of malicious prosecution [or] violation of chapter 93A." Final judgment entered for the defendant, followed by the previously noted appeal to the Appeals Court and the grant of further appellate review here.

1. Summary judgment was improperly granted on the malicious prosecution claim. See *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 263 (1991); *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). The essence of the tort of malicious prosecution is "interference with the right to be free from unjustifiable litigation." *Foley* v. *Polaroid Corp.*, 381 Mass. 545, 552 (1980), citing W. Prosser, Torts § 119, at 834 (4th ed. 1971). The tort "is not confined to the wrongful

initiation of criminal proceedings; it may be maintained for the unjustifiable initiation of a civil action." *Hubbard* v. *Beatty & Hyde, Inc.*, 343 Mass. 258, 260-261 (1961). To prevail on a claim for malicious prosecution, a plaintiff must establish that he was damaged because the defendant commenced the original action without probable cause and with malice, and that the original action terminated in his favor. *Id.* at 261. See *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593 (1982). The defendant here, of course, commenced the medical malpractice action against the plaintiff, but contends that it is entitled to summary judgment on all other elements of the tort.

a. *Probable cause.* On the element of probable cause, "it has been said — and with good reason — that 'less in the way of grounds for belief will be required to justify a reasonable man in bringing a civil rather than a criminal [proceeding].' Prosser on Torts (2d ed.) p. 665." *Hubbard* v. *Beatty & Hyde, Inc.*, *supra* at 261. "All that is necessary, where civil proceedings are involved, is that the 'claimant reasonably believe that there is a chance that his claim may be held valid upon adjudication.' " *Id.* at 262, quoting Restatement of Torts § 675 comment e.

The defendant relies on *Bednarz* v. *Bednarz*, 27 Mass. App. Ct. 668, 672 (1989), which cites to our *Hubbard* decision, as well as the Restatement (Second) of Torts § 675 (1977) (entitled, "Existence of Probable Cause").[6] The defendant contends that "[t]he applicable test is whether Bolger and Moscala 'reasonably believe[d]' that there [was] a chance that [the medical malpractice action] might be held valid upon adjudication." The definition of probable cause under § 675 does not materially differ from the standard stated in the *Hubbard* case. Section 675 provides:

> "One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and . . . correctly or reasonably believes that under those

---

[6]Under the Restatement (Second) of Torts c. 30 (1977), the tort of malicious prosecution is called the "wrongful use of civil proceedings."

facts the claim may be valid under the applicable law
. . . ."[7,8]

"Generally, the decisions have held that probable cause is judged by an objective, rather than a subjective standard." *Bednarz* v. *Bednarz, supra* at 672 n.5, and cases cited. We examine "the information known to [the defendant] 'at the time [it] instituted the complaint rather than . . . what may turn out later to have been the actual state of things.' " *Carroll* v. *Gillespie*, 14 Mass. App. Ct. 12, 19 (1982), quoting *Lincoln* v. *Shea*, 361 Mass. 1, 5 (1972). "Implicit in this inquiry, however, is the question whether it was reasonable for the defendant to have relied upon that information, given its quality, quantity, and the availability of additional information." *Carroll* v. *Gillespie, supra* at 19-20. A lack of probable cause "must be affirmatively proved, and may not be inferred from the existence of malice . . . or from the fact of acquittal or anything else" (citations omitted). *Higgins* v. *Pratt*, 316 Mass. 700, 709 (1944). When the facts are disputed, probable cause is a question for the jury. *Gutierrez* v. *Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 405 n.10 (2002); *Carroll* v. *Gillespie, supra* at 18-19 n.10.

We agree with the Appeals Court that the plaintiff offered sufficient evidence to raise a genuine and material factual dispute concerning whether the defendant (here its decision makers Bolger and Moscala)[9] *reasonably* believed that a *sound*

---

[7]The defendant does not rely on the advice of counsel formulation of probable cause as stated in the Restatement (Second) of Torts § 675 (1977).

[8]The comments to § 675 make clear that the possibility or "chance" contemplated must be sound: "In determining probable cause for initiation of civil proceedings, all that is necessary is that the claimant reasonably believe that there is a *sound* chance that his claim may be held legally valid upon adjudication" (emphasis added). Restatement (Second) of Torts, *supra* at § 675 comment e. "The question is not whether he is correct in believing that the court would sustain the claim, but whether his opinion that there was a *sound* chance that the claim might be sustained was a reasonable one" (emphasis added). *Id.* at § 675 comment f. This amplification is consistent with notions of reasonableness.

[9]"The summary judgment record shows that Moscala knew only what Bolger told him, and that Bolger knew what Pacheco had told her, plus Bolger's own review of the claim file and one telephone conversation with Abrahams." *Chervin* v. *Travelers Ins. Co.*, 65 Mass. App. Ct. 394, 401 (2006).

chance existed that the medical malpractice claim might be held valid on adjudication. See *Chervin* v. *Travelers Ins. Co.*, 65 Mass. App. Ct. 394, 403 (2006). There is evidence from which a jury could infer that it was unreasonable for the defendant to rely on Abrahams's statements. Bolger and Moscala knew from claim notes that Abrahams's opinion (that the defendant had slightly over a fifty per cent chance of success on a medical malpractice action) was directly contradicted by the opinions of four other attorneys. These lawyers had concluded that even if Mosher's doctors had intervened properly, the accident still would have occurred (because of Mosher's own sizable negligence), thus precluding recovery under the comparative fault principles of G. L. c. 231, § 85. The defendant's employees should have been aware of the defendant's own expert neurologists' opinions indicating that Mosher was responsible for the injuries he sustained due to his own noncompliance with taking Dilantin and abstaining from alcohol.[10] Bolger and Moscala knew that a successful medical malpractice action also depended on Mosher's cooperation, which, at best, was uncertain and difficult to obtain. More significantly, they had never met Abrahams and had no knowledge of the identity or qualifications of her putative expert on whom she relied or what information she had relayed to the expert to render an opinion. Further, they knew that Abrahams's discussions with the unidentified expert were made only on a "preliminary basis."

A jury could find that any reliance on the opinions of Reilly, Schneider, and Sullivan (if indeed Sullivan even was consulted prior to the filing of the subrogation action) — that a medical malpractice claim should be pursued — was not reasonable in view of the significant problems identified above (lack of cooperation by Mosher, the absence of an identifiable expert's opinion, expert evidence indicating Mosher's considerable fault) and the fact that Bolger and Moscala had no knowledge whether

---

[10]While there was evidence that Mosher had some alcohol in his system at the time of the accident, there is no evidence indicating that the defendant had affirmatively established that the amount of alcohol was negligible or that Mosher had been intoxicated. See note 5, *supra.*

Reilly, Schneider, or Sullivan had any experience with medical malpractice claims.[11]

The defendant argues that further evidence offered by the plaintiff to demonstrate a lack of probable cause, namely, the dismissal of the subrogation action, might, under Restatement (Second) of Torts, *supra* at § 675 comment b, furnish evidence of probable cause based on "the circumstances under which the proceedings were withdrawn or dismissed." The defendant contends that, "[b]ecause Mosher's cooperation would have been necessary to successfully litigate the case, [the defendant's] decision was rational, and does not indicate that [the defendant] lacked probable cause when it filed suit." The defendant overlooks that Mosher's cooperation was not the only requirement for successful litigation of the subrogation action. The defendant also needed an opinion from an identifiable expert. The lack of expert evidence, combined with the reports of the defendant's two expert neurologists that highlighted the virtually insurmountable obstacle of overcoming Mosher's comparative negligence, creates a jury issue whether the dismissal of the subrogation action constitutes evidence of probable cause.

We additionally point out as significant that pertinent claim notes often obscured the bases of the claims against the plaintiff and Richter. In its brief, the defendant refers to the fact that Bolger and Moscala understood that the claims against the plaintiff related to his "failure to warn [Mosher] on the danger of drinking and taking medication for his condition." However, the complete portion of Pacheco's claim note states: "I believe that any potential third party claim would be against [Mosher's] treating physician for failure to warn Mosher on the danger of drinking and taking medication for his condition." In her deposition, Pacheco states that the doctor to whom she was referring as the "treating physician" was Mosher's primary care physician, which was Richter and not the plaintiff. While the issue of probable cause cannot be assessed on evidence existing subsequent to the filing of the subrogation action, Bolger and Moscala knew (or should have known) from reviewing the claim that the plaintiff was a neurologist and had last treated

---

[11]All of this evidence would permit a fact finder also to conclude that there was no "sound chance" that the subrogation action would be found valid.

Mosher some four months before the accident. A jury could find that anyone relying on these claim notes should have clarified the intended reference in the notes if a decision was to be based on the reference to file suit. This particularly is so where two physicians were involved. Similarly, Pacheco's claim note that the unidentified expert told Abrahams "that certain protocols should have been taken (detox, revoke license and family involvement)" did not specify which doctor (the plaintiff or Richter), or even whether both doctors, should have taken such actions. The objective facts surrounding the defendant's decision to file the subrogation action did not permit summary judgment on the issue of probable cause.

b. *Purpose.* The plaintiff refers to the principles set forth in the Restatement (Second) of Torts § 676 (1979) pertaining to the "propriety of purpose" element of the tort of wrongful use of civil proceedings, and contends that he has satisfied the unlawful purpose element of malicious prosecution by producing "evidence sufficient to permit a jury to find that [the defendant] did not actually believe its claim to be meritorious."

Section 676 provides:

> "To subject a person to liability for wrongful civil proceedings, the proceedings must have been initiated or continued primarily for a purpose other than that of securing the proper adjudication of the claim on which they are based."

Comment c to § 676 states:

> "There are numerous situations in which the civil proceedings are initiated primarily for an improper purpose. *Some of them* have been established as patterns and may be described in some detail. The following are *illustrative*:

> "The first situation arises when the person bringing the civil proceedings is aware that his claim is not meritorious. Just as instituting a criminal proceeding when one does not believe the accused to be guilty is not acting for the proper purpose of bringing an offender to justice (see § 668, Comment b), so instituting a civil proceeding when

one does not believe his claim to be meritorious is not acting for the purpose of securing the proper adjudication of his claim. One may believe that his claim is meritorious even though he knows that the decisions in the [S]tate do not sustain it if he believes that the law is potentially subject to modification and that this case may be a suitable vehicle for producing further development or change. He may believe that his claim is meritorious if he believes that the actual facts warrant the claim but recognizes that his chances of proving the facts are meager. He cannot believe that the claim is meritorious, however, if he knows that it is a false one based upon manufactured or perjured testimony, or if he realizes that the adjudication will not be in his favor unless the court or jury is misled in some way. He is then abusing the general purpose of bringing civil proceedings and is not seeking a proper adjudication of the claim on which the civil proceeding is based.

"The second situation arises when the proceedings are begun primarily because of hostility or ill will. This is 'malice' in the literal sense of the term, which is frequently expanded beyond that sense to cover any improper purpose. . . .

"A fourth situation arises when the proceedings are initiated for the purpose of forcing a settlement that has no relation to the merits of the claim. This occurs, for example when a plaintiff, knowing that there is no real chance of successful prosecution of a claim, brings a 'nuisance suit' upon it for the purpose of forcing the defendant to pay a sum of money in order to avoid the financial and other burdens that a defense against it would put upon him. A further instance occurs when the proceedings are based upon alleged facts so discreditable as to induce the defendant to pay a sum of money to avoid the notoriety of a public trial." (Emphasis added.)

As can be seen from the underscored language in comment c, the situations described are illustrative and not inclusive. Although the text of § 676 does not contain the words "improper purpose," the comments make clear that the section deals with the "impropriety of purpose," or "improper purpose." Restatement (Second) of Torts, *supra* at § 676 comments b and c. Referenc-

ing § 676 as the "improper purpose" element is, thus, a fair characterization.

We have, in connection with the tort of malicious prosecution, defined "malice" as denoting something other than what may be encompassed in the literal sense of the term. In *Wills* v. *Noyes*, 12 Pick. 324, 327-328 (1832), we stated:

> "The malice necessary to be shown in order to maintain [an action for malicious prosecution], is not necessarily revenge or other base and malignant passion. Whatever is done wilfully and purposely, if it be at the same time wrong and unlawful, and that known to the party, is in legal contemplation malicious. That which is done contrary to one's own conviction of duty, or with a wilful disregard of the rights of others, whether it be to compass some unlawful end, or some lawful end by unlawful means, or . . . to do a wrong and unlawful act knowing it to be such, constitutes legal malice."

We went on to say in *Wilder* v. *Holden*, 24 Pick. 8, 11 (1833), that malice may be inferred from a lack of probable cause, and that "[m]alice is *any wrong or unjustifiable motive.* Of the existence of this the want of probable cause is not only evidence, but very strong evidence." (Emphasis added.)

In *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593-594 (1982), we stated that, in different circumstances, where an attorney was acting on behalf of his client, "[t]o succeed on a claim of malice in a malicious prosecution action, [the plaintiff] must demonstrate that (1) [the defendant attorney] knew that there was no probable cause for the prosecution *and* (2) [the defendant attorney] either personally acted with an improper motive or he knew that [the defendant attorney's client] was motivated by malice." We quoted our definition of malice from *Wills* v. *Noyes*, *supra*, and stated that "improper motive may be one of vexation, harassment, annoyance, or attempting to achieve an unlawful end or a lawful end through an unlawful means." *Beecy* v. *Pucciarelli*, *supra* at 595 n.9. We also relied on the Restatement (Second) of Torts § 674 comment d (1977).[12] *Id.* at 594.

We have not formally substituted the "improper purpose"

---

[12]Comment d to § 674 of the Restatement (Second) of Torts, *supra*, pertains

element appearing in § 676 of the Restatement (Second) of Torts for the element of malice in malicious prosecution. We conclude that now doing so would be consistent with our expressions of what constitutes malice. Such "reform is not a drastic or radical incursion upon existing law. In no serious way will an existing interest be impaired or an expectation be disappointed or a reliance be defeated." *Wynne* v. *Rosen*, 391 Mass. 797, 803 (1984), quoting *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 167 (1973). We, therefore, adopt the "improper purpose" formulation in § 676 of the Restatement (Second) of Torts in place of the element of "malice."

The materials before the judge raise jury issues on the purpose element. A jury should consider whether the defendant was motivated to assert legitimate legal rights, but rather was motivated by an improper purpose because it "institut[ed] a civil proceeding when [it did] not believe [its] claim to be meritorious" or did so to "forc[e] a settlement that has no relation to the merits of the claim," Restatement (Second) of Torts, *supra* at § 676 comment c (first and fourth situations). Both of these latter motives under *Wilder* v. *Holden, supra,* could be considered motives that were "wrong or unjustifiable." A non-exhaustive review of the record shows evidence that: Bolger had read the claim notes before talking and deciding with Moscola to file the subrogation action; the defendant spent over two years in connection with the workers' compensation case maintaining that Mosher's accident was caused by his own wil-

---

to attorneys sued for initiating wrongful civil proceedings. The comment provides, in pertinent part:

> "An attorney who initiates a civil proceeding on behalf of his client or one who takes any steps in the proceeding is not liable if he has probable cause for his action (see § 675); and even if he has no probable cause and is convinced that his client's claim is unfounded, he is still not liable if he acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim. (See § 676). . . . If, however, the attorney acts without probable cause for belief in the possibility that the claim will succeed, and for an improper purpose, as, for example, to put pressure upon the person proceeded against in order to compel payment of another claim of his own or solely to harass the person proceeded against by bringing a claim known to be invalid, he is subject to the same liability as any other person."

ful misconduct; two of the defendant's own experts, neurologists, expressed opinions that Mosher was at fault for the accident; the defendant knew that several attorneys who evaluated the case to determine whether the subrogation action was viable had concluded that it was not because Mosher's comparative negligence would exceed any negligence of the physicians; the defendant asserted that the physicians were at fault for Mosher's accident only after it had paid Mosher a substantial settlement; before the workers' compensation settlement, Reilly did not think Schneider's suggestion of a medical malpractice action was viable or had a chance to succeed; the defendant knew Mosher's cooperation in a subrogation action would be essential, but was well aware that his assistance was at best uncertain and would be difficult to obtain; Abrahams only gave an opinion (of a slightly over fifty per cent chance of success) based on a "preliminary" discussion with an unidentified expert whose qualifications were unknown; Bolger and Moscola's stated reason for filing the subrogation action was "based on the paids"; Bolger sought to engage counsel on a basis that would allow the defendant to abandon the claim at any time; and the defendant lacked an expert opinion to support its medical malpractice action.

The defendant argues that different inferences should be drawn from some of this evidence. This, of course, may be true, but that task involves weighing and crediting evidence, and it is one appropriately left for a jury. If the summarized evidence is accepted by a jury, they could reasonably find that the defendant filed its subrogation action with an improper purpose.

c. *Favorable termination.* The plaintiff must also show that the action brought "has been terminated in [his] favor." *Wynne* v. *Rosen*, 391 Mass. 797, 798 (1984). The defendant's subrogation action was dismissed, and judgment entered for the plaintiff in response to his application pursuant to Mass. R. Civ. P. 33 (a), after the defendant failed to have Mosher complete, sign, and serve answers to interrogatories.[13] The defendant essentially

---

[13]The defendant depicts itself as an innocent victim: "[the defendant] had no choice when Mosher declined to cooperate." The defendant, however, knew from the outset that Mosher's failure to cooperate was a real possibility, if not a probability.

acquiesced in dismissal because it had failed to provide the required discovery. The defendant failed to prosecute its case. The plaintiff has satisfied his burden of demonstrating the element of favorable termination. See Restatement (Second) of Torts, *supra* at § 674 comment j (favorable termination established by dismissal of proceedings because of failure to prosecute them). Cf. *Cardival* v. *Smith*, 109 Mass. 158, 159 (1872) ("When the suit complained of is a civil action, wholly under the control of the plaintiff therein, it would seem that a discharge thereof by him, without any judgment or verdict, is a sufficient termination of the suit").

d. *Damages.* The record demonstrates genuine issues of material fact on the plaintiff's damages. See *Foley* v. *Polaroid Corp.*, 381 Mass. 545, 552 (1980). The filing of a malpractice action against a physician, which becomes a public record, amounts to a statement "that may prejudice the [physician's] profession or business." *Chervin* v. *Travelers Ins. Co.*, 65 Mass. App. Ct. 394, 408 (2006) (Brown, J., dissenting), quoting *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 630 (2003). See *Malone* v. *Belcher*, 216 Mass. 209, 212 (1913) ("It is settled that in an action for malicious prosecution damages may be received for injury to business, reputation and feelings"); Restatement (Second) of Torts, *supra* at § 681. The plaintiff does not now need to prove his damages with certainty. The defendant's evidence, challenging the plaintiff's evidence on damages, should be weighed by a jury.

2. The plaintiff's G. L. c. 93A claim requires only brief discussion. "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983), the boundaries of what may qualify for consideration as a [G. L.] c. 93A violation is a question of law. See *Mechanics Nat'l Bank of Worcester* v. *Killeen*, 377 Mass. 100, 108-110 (1979)." *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 414 (1991), *S.C.*, 412 Mass. 703 (1992). While the plaintiff correctly maintains that part of the defendant's business is litigating subrogration claims, he cannot establish that he had any relevant business transaction with the defendant which would serve as a predicate for liability under G. L. c. 93A, §§ 2 and

11. See *Szalla* v. *Locke*, 421 Mass. 448, 451-452 (1995); *Arthur D. Little, Inc.* v. *East Cambridge Sav. Bank*, 35 Mass. App. Ct. 734, 743 (1994). In that regard, a business relationship was not created by the defendant's filing of the subrogation action that only asserted a medical malpractice claim. Cf. *First Enters., Ltd.* v. *Cooper*, 425 Mass. 344, 348 (1997). Dismissal of the plaintiff's claim under G. L. c. 93A was proper.

3. The portion of the judgment dismissing the plaintiff's claim under G. L. c. 93A is affirmed. The portion of the judgment dismissing the plaintiff's claim of malicious prosecution is reversed, and that claim is remanded to the Superior Court for further proceedings.

*So ordered.*