Rutberg, J.
Around 5:00 RM. on July 30, 2003, George Mizhir, III (“Mizhir”) retrieved his Chevy Blazer from an automobile dealer who was doing routine maintenance on it and drove to “the big chair”[3] in Gardner to meet a potential real estate client. As Mizhir arrived in the vicinity of the big chair, police swooped in with guns drawn and arrested him, without a warrant, on drug charges. An inventory search of the Blazer was conducted and a bag of cocaine was found in a compartment next to a rear door. Mizhir was charged with possession of cocaine with the intent to distribute in a school zone, a charge that carries a minimum mandatory two-year period of incarceration, without parole. Mizhir had no prior criminal record.
Fifteen months after Mizhir’s arrest, his motion to suppress the contraband seized from his Blazer was allowed, and all of the criminal charges against him were dismissed on November 26, 2004. Three months later, Mizhir filed this malicious prosecution action[4] against the three individuals he believed set up his arrest. One of three original defendants, Brian McCarty (“McCarty”), defaulted and, after an assessment of damages, judgment was entered against him for $25,000.00. The case against the two remaining defendants was tried before a jury, which answered special questions put to them by the trial judge. Judgment for $200,000.00 was entered against both of the defendants, jointly and severally. Both defendants then filed separate motions for (1) a new trial, (2) entry of judgment notwithstanding the verdict, or (3) a remittitur.
All of the defendants’ posttrial motions were denied, and defendant Jenny Carbonneau (“Carbonneau”) filed this appeal of those rulings.
Carbonneau contends that the trial judge erred in denying her request for judgment notwithstanding the verdict (“judgment n.o.v.”) on Mizhir’s claim of malicious prosecution. She argues further that if the malicious prosecution claim fails, Mizhir’s other claims for relief for infliction of emotional distress and conspiracy must also fail.
In reviewing the denial of Carbonneau’s motion for judgment n.o.v., we must view the evidence in the light most favorable to Mizhir, resolving all reasonable inferences in his favor to determine if Carbonneau is entitled to judgment as a matter of law. Donaldson v. Farrakhan, 436 Mass. 94, 96 (2002); Waite v. Goal Sys. Intl, Inc., 55 Mass. App. Ct. 700, 701 (2002).
*59 The evidence, when viewed in the light most favorable to Mizhir, reveals a sordid tale of intrigue and deception akin to pulp fiction. Defendant McAuliff was an automobile mechanic working in Fitchburg and living with Maryann Hardy (“Hardy”) and her two teenage children. Hardy and Mizhir worked at the same real estate brokerage. Three weeks before Mizhir was arrested, Hardy abruptly ended her relationship with McAuliff and moved in with Mizhir. McAuliff was brokenhearted and devastated, and he poured his heart out to Carbonneau, who had been his friend for several years. McAuliff was furious with Mizhir, whom he had never met, and his fury extended to making actual telephone threats to Mizhir to harm him.
Defendant McCarty was a paid “snitch” for the Worcester County Drug Task Force, although his prime motivation was not money, but ridding the streets of drugs. McCarty hung out at McAuliff s garage several days each week, sometimes running errands for McAuliff. Eventually, McAuliff learned something about McCarty’s “work” with the local police and offered to assist their efforts because he claimed to know “everything that is going on in Fitchburg.” A couple of weeks before Mizhir was arrested, McAuliff actively began to assist McCarty by driving him to a residence on Myrtle Avenue in Fitchburg and pointing to a white sport utility vehicle (“SUV”) with the license plate of “MIZHIR.” McCarty mentioned to McAuliff that Myrtle Street was known as “Crack Alley” in Fitchburg. McAuliff persisted in trying to encourage McCarty to cause Mizhir to be investigated for drug sales, eventually driving McCarty to the Thirsty Turtle bar. McAuliff entered the bar, leaving McCarty in the car, and returned minutes later, telling McCarty that someone in the bar confirmed that Mizhir had been there the night before selling cocaine. McCarty relayed this information to his handlers at the Drug Task Force. Eventually, the police decided to arrest Mizhir based solely on the information they had received from McCarty, all of which had come from McAuliff. The police wanted to arrest Mizhir in Fitchburg where his office was located; but on the day of the planned “bust,” Mizhir did not go to his office because his car needed servicing.
On the morning the police intended to arrest Mizhir, a woman identifying herself as Michelle Maki (“Maki”) made a cold call to Mizhir’s real estate office and asked for Mizhir. An office employee explained that Mizhir was not expected to be in the office that day, but there was another salesperson assigned to assist customers. Maki insisted, however, both on meeting with Mizhir and holding the meeting that very day. A series of subsequent phone calls between Maki, Mizhir’s office, and Mizhir resulted in Mizhir agreeing to meet Maki after 5:00 P.M., by which time the work on his Chevy Blazer would be completed. Maki told Mizhir the only place she knew in Gardner was the big chair, which happens to be located in front of a school. Mizhir agreed to meet this new customer at the big chair at 5:30 that afternoon. Cell phone records introduced into evidence were sufficient to support the jury’s conclusion that “Michelle Maki” was indeed Carbonneau.
Mizhir arrived at the scene as planned and parked his car across the street from the big chair. As noted, a number of police vehicles suddenly surrounded Mizhir’s Chevy Blazer, and he was arrested at gunpoint without a warrant. Given the amount and the packaging of the cocaine seized during the arrest, the police concluded that it was intended for sale and charged Mizhir with a number of drug offenses, including possession of cocaine with intent to distribute in a school zone, that carried lengthy mandatory sentences.
*60 1. As stated above, Carbonneau maintains that all of Mizhir’s claims rise and fall on the malicious prosecution count. The elements of this action are that the defendant: (1) acts to initiate criminal proceedings being brought against the plaintiff; (2) with malice toward the plaintiff; (3) without probable cause; and (4) such proceedings must terminate in the plaintiffs favor. Sklar v. Beth Israel Deaconess Med. Ctr., 59 Mass. App. Ct. 550, 557 (2003).
The evidence was sufficient to allow the jury to find that Carbonneau participated in activities that resulted in drug charges being proffered against Mizhir. There was evidence that Carbonneau posed as Michelle Maki and actively drew Mizhir to the big chair on a ruse. The calls made by Michelle Maki were made on a cell phone over which Carbonneau usually had control; indeed, Carbonneau acknowledged that she probably placed many of the other calls made on that phone before and after those attributed to Michelle Maki. When taken in the light most favorable to Mizhir, his own testimony that Carbonneau’s voice was the one he heard when he spoke to Michelle Maki would be sufficient to establish this element of malicious prosecution. It should also be noted that Michelle Maki insisted on meeting Mizhir at the big chair at 5:30 P.M., and that Mizhir was arrested there a few minutes before that time. Neither Carbonneau, nor anyone posing as Michelle Maki, appeared at the scene while Mizhir was present, which certainly allows a jury to infer that the person who set up the meeting knew it was a ruse.
Carbonneau also claims that there was no evidence presented that she acted with any malice toward Mizhir. However, there was more than ample evidence that McAuliff was rageful toward Mizhir and threatened him physically. There was testimony from Carbonneau that she and McAuliff were close friends and that they spoke at length about the cause and fallout of the breakup of his relationship with Hardy. From this evidence, the jury could infer that Carbonneau shared McAuliff s contempt for Mizhir and that her actions were motivated by this contempt. Additionally, malice can properly be inferred from the lack of probable cause. Wilder v. Holden, 24 Pick. 8, 11 (1833). The jury’s finding that Carbonneau acted maliciously was properly supported.
Regarding the element of lack of probable cause, Mizhir showed the jury that the only information that McAuliff could have given the police through their agent, McCarty, was that Mizhir’s car was parked on Crack Alley and that McAuliff told McCarty that someone in the Thirsty Turtle bar told McAuliff that Mizhir had sold cocaine there the previous evening. The jury learned of the contents of this conversation through McCarty’s testimony, as McAuliff did not appear to testify himself. The trial judge properly instructed the jury that they could draw an adverse inference against McAuliff because he did not testify. Grady v. Collins Transp. Co., 341 Mass. 502 (1960); Attorney Gen. v. Pelletier, 240 Mass. 264 (1922). The jury was within their province to disregard entirely McAuliff’s hearsay statement to McCarty, leaving the state of the evidence — as viewed in the light most favorable to Mizhir — that Mizhir’s car was legally parked on Myrtle Street, a city street that some people refer to as Crack Alley. That evidence, alone, is not probable cause that Mizhir was committing a drug offense while he was sitting in his car days later in a different location.
Carbonneau finally argues that as a matter of law, the criminal proceedings were not terminated in Mizhir’s favor. Following the allowance of Mizhir’s motion to sup *61 press the evidence seized from him at the time of his arrest, the Commonwealth moved to dismiss all charges then pending against him, and this motion was allowed. Prior to 1984, the Supreme Judicial Court “consistently adhered to the rule that a nolle prosequi of... a complaint is an insufficient basis on which to allege a termination in favor of the plaintiff [for malicious prosecution purposes].” Wynne v. Rosen, 391 Mass. 797, 799 (1984).
In Wynne, however, the Supreme Judicial Court abandoned their “stand alone” position that dated back to 1849, and they held that “a criminal proceeding is terminated in favor of the plaintiff when the district attorney formally abandons the criminal proceedings by a nolle prosequi or a motion to dismiss.” Id at 800. The Court went on to add that the reasons for the nolle prosequi or dismissal “must be consistent with the innocence of the accused. The circumstances of the abandonment must compel an inference that there existed a lack of reasonable grounds to pursue the prosecution.” Id at 800-801. Finally, the Court added, “A criminal prosecution terminated by nolle prosequi on the basis of a procedural or technical defect will not suffice as a final favorable termination.” Id at 801.
While there is no case law directly on point, we conclude that a motion to dismiss criminal charges predicated on the suppression of evidence necessary to set out a prima facie case is a termination in favor of a plaintiff for purposes of maintaining an action in malicious prosecution. In announcing its groundbreaking ruling in Wynne, the Supreme Judicial Court cited the RESTATEMENT (SECOND) OF TORTS in support of its holding, including extensive quotations of §§659 and 660 in the margin. Id. at 800 n.4. Section 659 states that “[c]riminal proceedings are terminated in favor of the accused [plaintiff] by... (c) the formal abandonment of the proceedings by the public prosecutor.” Id, quoting RESTATEMENT (SECOND) OF TORTS §659(c) (1977). The following section of the RESTATEMENT goes on to spell out four specific terminations that it deems insufficient to meet the criteria of a favorable termination. Id, quoting RESTATEMENT (SECOND) OFTORTS §660 (1977).[5]The common thread among these types of terminations is either extrajudicial conduct of the accused in causing the termination, or the institution of new criminal proceedings. We do not equate Mizhir’s attempt to enforce his constitutional rights with an agreement of compromise, misconduct, or a request for mercy.
After quoting from the RESTATEMENT, the Supreme Judicial Court in Wynne then cites long-held Massachusetts law that “where a nolle prosequi is entered by the procurement of the party prosecuted, or by his consent, or by way of compromise, such a party cannot have an action for malicious prosecution.” Id. at 801, quoting Langford v. Boston & Albany R.R., 144 Mass. 431 (1887). As the Court specifical *62 ly reiterated its approval of those circumstances that do not meet the criteria for a favorable termination, and as those circumstances appear to echo the RESTATEMENTS list, we conclude that the absence of termination caused by the suppression of evidence from either list is meaningful.
As we have concluded that the trial judge was correct in denying Carbonneau’s motion for judgment n.o.v. on the count of the complaint that sounds in malicious prosecution, there is no need to analyze whether the trial judge appropriately denied her motion with regard to the remaining counts that sound in infliction of emotional distress and civil conspiracy. The measure of damages is the same for each count, and the trial judge so instructed the jury without objection.
2. On the last page of her brief, in the “Conclusion” section, Carbonneau raises the issue of damages. In mentioning this issue, she said that the jury found McAuliff “six-times more liable” than her, and that “[i]f the jury believed that the entire burden of the judgment would be placed solely on Carbonneau, they would not have rendered such a disproportionately larger verdict.” Rule 16(a) (4) of the Dist./Mun. Cts. R. A. D. A. provides that we “need not pass upon questions or issues not argued in the brief' Carbonneau’s late mention of the damages issue falls far short of the Rule’s minimum requirement for briefs that “[t]he argument, ... shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on.” Id. Therefore, Carbonneau has waived the issue of damages; nevertheless, we wish to address this issue in light of the rather unusual course of events that occurred as the jury returned their verdict. The facts surrounding the determination of the damages award require some exposition.
There were four substantive counts on which the judge instructed the jury: libel, malicious prosecution, infliction of emotional distress, and civil conspiracy. The judge instructed the jury on these issues in the order stated above; however, he addressed the issue of damages as he instructed on the law of malicious prosecution. The instruction to the jury was that they were to “determine the amount of damages the plaintiff is entitled to receive to compensate him for the injury that caused the wrong.” The judge went on to describe properly the purpose of damages and set forth the types of injuries that the plaintiff could have sustained that are compensable. He spoke only in terms of the damages sustained by the plaintiff, and he never attempted to separate the relative culpability or amount of liability of either defendant. There were no objections to these instructions.
The trial judge made no mention of damages with respect to the counts of infliction of emotional distress or civil conspiracy. The judge prepared a set of special jury questions to which there was no objection. The special questions appear to be in two sections.[6] The first section contained four questions directed to the four substantive counts described above; each question required a “yes” or “no” answer to be made *63 with respect to each of the two defendants’ liability on the particular issue.[7] The other section was devoted to damages. As stated above, the trial judge instructed the jury that if they found either defendant liable on any count, they were then to determine damages, saying “it applies to everything.” He then said:
[Yjou’ll see there are lines for both Mr. McAuliff and Ms. Carbonneau. The damages are — should total 100 per cent, and I’ve given you [separate lines for] Mr. McAuliff and Ms. Carbonneau sort of to go along [or be consistent] with everything else. But the total is only 100 percent. I want to make that clear.
So it’s not 100 percent against one and 100 percent against another to make 200 percent, it’s 100 percent total, okay.
While deliberating, the jury sent the following question to the trial judge: “Are there any guidelines on the amount of money for damages?” He then reinstructed the jury on the issue of damages, specifically discussing several potential components of a damages award. Again, his instructions were directed to the amount of damages to which the plaintiff was entitled with no distinction made between the two defendants.
As footnote 7 states, the jury found McAuliff liable on all counts and Carbonneau liable on all counts save the libel. The clerk read the questions, while the foreperson answered. The clerk then said, “I’m going down to damages. For Michael McAuliff, what are the damages in the amount of?” The foreperson answered, “170,000.” The clerk then asked, “From Jenny Carbonneau?” The foreperson answered, “$30,000.” The clerk then said, “For a total of $200,000?” The foreperson responded, “Yes.” Later, the judge confirmed with the jury as follows: “I just want to make it clear. The total amount of damages that you wish to order in this case is $200,000?” — to which an unnamed juror responded, ‘Yes.” The judge then asked, “Is that right, all of you?” — to which they responded, Yes.”
The judge then excused the jury to confer with counsel. He asked if anyone wished to be heard, and Mizhir’s counsel inquired as to how these amounts were to be translated into judgments, to which the trial judge stated, “The judgment will be in the amount of $200,000, jointly and severally.” Neither Carbonneau, nor her counsel, objected.
In her motion for a remittitur, Carbonneau argues that the total amount of damages is excessive, unreasonable, and unsupported by the evidence; and, she requested that the trial judge reduce the damages award or “order that the respective amounts assessed to each defendant separately by the jury be held... to be individual and severable and not be joint and several.” The motion was denied in all respects.
With regard to the amount of damages stated above, the judge properly instructed the jury as to the proper components of damages, and we find their award to be consistent with the evidence. The fact that Mizhir did not produce documentary evidence to support his claims for attorney’s fees did not prevent the jury from credit *64 ing his testimony on those expenses. Additionally, Mizhir testified at length as to the profound emotional distress he had suffered as a result of the defendants’ tortious behavior. In determining damages, the jury could have given substantial weight to his testimony regarding the effect that his public arrest, arraignment, and continued court hearings had on his reputation and earning capacity.
A question remains as to the propriety of the trial judge’s ruling that the sum of the damages awards made with regard to the two defendants was to be a joint and several judgment against both defendants. “Where there are several defendants and joint liability is established, the decree should be against each and all of them.” Gross-Loge Des Deutschen Ordens Der Harugari Des Staates Mass. v. Cusson, 301 Mass. 332, 335 (1938), citing Gray v. Chase, 184 Mass. 444, 450 (1903). If it has been established that two or more defendants are joint tortfeasors, the analysis then turns to potential severability of the harm done to the plaintiff.
[I]f two or more wrongdoers negligently contribute to the personal injury of another by their several acts, which operate concurrently, so that in effect the damages suffered are rendered inseparable, they are jointly and severally liable.
O’Connor v. Raymark Indus., Inc., 401 Mass. 586, 591 (1988), quoting Chase v. Roy, 363 Mass. 402, 408 (1973).
There can be no question that the jury found that these two defendants had acted together, as the jury found both Carbonneau and McAuliff liable on Mizhir’s claim of civil conspiracy. “The very heart of the tort of conspiracy is the combination.” J.R. NOLAN & L.J. SARTORIO, TORT LAW §6.3, at 142 (3d ed. 2005). The trial judge properly instructed the jury as to the elements of this tort.
Further, from the evidence, there can be no doubt that the damages suffered by Mizhir were “rendered inseparable” with respect to these two defendants. Indeed, the trial judge instructed the jury to “determine the amount of damages the plaintiff is entitled to receive to compensate him for the injury that caused the wrong.” No attempt was made to separate Mizhir’s damages; and, while we can ascertain no reason that the trial judge would need to know the relative culpabilities of the two defendants, his request to the jury to prorate responsibility does not defeat the law of damages. The trial judge clearly confirmed what the jury’s determination of damages was before ordering that judgment be entered jointly and severally for the total damages found. See Solimene v. B. Grauel & Co., KG, 399 Mass 790, 800 (1987). Abetter practice would have been to instruct the jury further on this potential inconsistency in their answers with a direction to resolve that inconsistency in the jury room. However, the method by which the trial judge polled the jury was within his sound discretion, and none of the parties either objected to his inquiry, or requested that the matter be resolved in the jury room.
When the RESTATEMENT (SECOND) OF TORTS was published in 1965, it added §433B that allows for defendants to limit their liability when “the harm is capable of apportionment among them.”
Notwithstanding the fact that the jury made separate damages awards against Carbonneau and McAuliff, the RESTATEMENT requires that the trial court make a threshold determination as to “whether the harm to the plaintiff is capable of apportionment among two or more causes.” RESTATEMENT (SECOND) OF TORTS §434 (1965). The trial judge implicitly ruled that, from the evidence, it was not pos *65 sible to apportion the harm that Mizhir sustained between the two conspirators. All of the elements of Mizhir’s damages that are described above derive from the fallout from his arrest; therefore, the trial judge’s implicit ruling is correct, as a contrary ruling could have produced prejudicial error.
Therefore, we find that there was no error in the trial judge’s direction that judgment be entered against McAuliff and Carbonneau for $200,000.00, jointly and severally.
The judgment of the trial court is affirmed.
So ordered.

 The “big chair” is, literally, a very large chair located in the middle of Gardner and is a landmark commemorating that city’s history of furniture making. Indeed, Gardner has been known as the “Chair City.”

 The complaint also contained claims for relief sounding in defamation, infliction of emotional distress (both intentional and negligent), and conspiracy. The gravamen of all of the claims for relief stems from Mizhir’s alleged “set up,” arrest, and prosecution.

 These terminations are: “if (a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused; or (b) the charge is withdrawn or the prosecution abandoned because of misconduct on the part of the accused or in his behalf for the purpose of preventing proper trial; or (c) the charge is withdrawn or the proceeding abandoned out of mercy requested or accepted by the accused; or (d) new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused.” Wynne, supra at 800 n.4, quoting RESTATEMENT (SECOND) OFTORTS §660 (1977).

 The Special Jury Verdict slip was not included in the record of appeal, and we were unable to obtain a copy from the Fitchburg District Court. What follows is reconstructed from the transcript of the judge’s instructions.

 The jury answered that McAuliff was liable on all four issues. While they found that Carbonneau was not liable on the count sounding in libel, they did find her liable on the remaining three counts.